Aaron D. Radbil (*pro hac vice*)
Alexander D. Kruzyk (*pro hac vice*)
GREENWALD DAVIDSON RADBIL PLLC
401 Congress Avenue, Suite 1540
Austin, Texas 78701
Phone: (512) 803-1578
aradbil@gdrlawfirm.com
akruzyk@gdrlawfirm.com

Michael L. Greenwald (*pro hac vice*)
GREENWALD DAVIDSON RADBIL PLLC
7601 North Federal Highway, Suite A-230
Boca Raton, Florida 33487
Phone: (561) 826-5477
mgreenwald@gdrlawfirm.com

Jason E. Greene (Bar No. 13990)
Jared D. Scott (Bar No. 15066)
ANDERSON & KARRENBERG, P.C.
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Phone: (801) 534-1700
jgreene@aklawfirm.com
jscott@aklawfirm.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| BRANDI WESLEY, *on behalf of herself and others similarly situated*, <br><br>            Plaintiff, <br><br> v. <br><br> SNAP FINANCE, LLC, <br><br>            Defendant. | **PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** <br><br> Civil Action No. 2:20-cv-00148-RJS-JCB <br><br><br> District Judge Robert J. Shelby <br><br> Magistrate Judge Jared C. Bennett |
| SNAP FINANCE, LLC, <br><br>            Third-Party Plaintiff, <br><br> v. <br><br> DERRICK DEON JACKSON, JR., a/k/a DERRICK JOHNSON, <br><br>            Third-Party Defendant. | |

## Table of Contents

Request for Relief ........................................................................................................... 1

The Telephone Consumer Protection Act ........................................................................ 1

Statement of Relevant Facts ........................................................................................... 2

Standard ......................................................................................................................... 5

Argument ........................................................................................................................ 6

    I.   Ms. Wesley satisfies the requirements of Rule 23(a). ......................................... 6

        A.   The proposed class is so numerous that joinder of all members is impracticable. ........ 6

        B.   Questions of law and fact are common to members of the proposed class. ................ 8

        C.   Ms. Wesley's claims are typical of the claims of the members of the proposed class. 9

        D.   Ms. Wesley and her counsel will fairly and adequately protect the interests of members of the proposed class. ..................................................................................... 11

            1.   Ms. Wesley will continue to fairly and adequately protect the interests of members of the proposed class, and she has no conflicts with them. ............................................... 11

            2.   Ms. Wesley's counsel will continue to fairly and adequately protect the interests of members of the proposed class, and they have no conflicts with them. ........................... 12

    II.   Ms. Wesley satisfies the requirements of Rule 23(b). ........................................ 12

        A.   The questions of law and fact common to members of the proposed class predominate over any questions affecting only individual class members. .............................................. 12

        B.   A class action is superior to other available methods for the fair and efficient adjudication of this matter. .................................................................................................. 15

    III.   The proposed class is ascertainable. .............................................................. 18

        A.   Ms. Wesley is not required to show at the class certification stage that there is an administratively feasible means of identifying absent class members; rather, she must simply show that her proposed class definition is based on objective criteria. .................... 18

        B.   Even if Ms. Wesley were required to show that there is an administratively feasible means of identifying absent class members—she is not—she is able to do so. .................. 22

    IV.   Ms. Wesley's proposed notice plan satisfies Rule 23(c)(2)(B). .................................... 23

Conclusion ..................................................................................................................... 25

## Table of Authorities

**Cases**

*Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) .......................... 6, 14, 16

*Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540 (6th Cir. 2014) ........... 22

*Asher v. Quicken Loans, Inc.*, No. 2:17-CV-1203, 2019 WL 131854  (D. Utah Jan. 8, 2019) .... 12

*Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434 (E.D. Mich. 2015) .................................................. 22

*Banks v. Cent. Refrigerated Servs., Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056 (D. Utah May 2, 2017) ....................................................................................................................... 18

*Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335 (2020) ................................. 1, 25

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014) ...................... 8, 9, 17

*Bonoan v. Adobe Inc.*, No. 3:19-CV-01068-RS, 2020 WL 6018934 (N.D. Cal. Oct. 9, 2020).... 25

*Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320 (W.D. Okla. 2018) ................... 8, 22, 23

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ..................................... 19, 21, 24

*Brown v. DirecTV, LLC*, 330 F.R.D. 260 (C.D. Cal. 2019) ......................................................... 17

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) ...................................................................... 19

*Cabrera v. Gov't Emps. Ins. Co.*, No. 12-61390-CIV, 2014 WL 11894430 (S.D. Fla. Sept. 29, 2014) ....................................................................................................................................... 8, 10

*Carrera v. Bayer Corp.*, No. 2-08-cv-04716, 2014 WL 3887938 (3d Cir. May 2, 2014) ........... 18

*Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021) ..................................................... 19, 21

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 67 F.3d 434 (3d Cir. 2017) ............... 19

*C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679 (S.D. Fla. 2014) ....................................... 10

*Cortes v. Nat'l Credit Adjusters, L.L.C.*, No. 216CV00823MCEEFB, 2020 WL 3642373 (E.D. Cal. July 6, 2020) ....................................................................................................... 8, 10, 13

*Custom Hair Designs by Sandy, LLC v. Cent. Payment Co., LLC*, No. 8:17CV310, 2020 WL 639613 (D. Neb. Feb. 11, 2020) ............................................................................................. 16

*DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935 (10th Cir. 2005) ..... 24

*Dilley v. Acad. Credit, LLC*, No. 2:07CV301DAK, 2008 WL 4527053 (D. Utah Sept. 29, 2008) ................................................................................................................................ 8

*Ditty v. Check Rite, Ltd.*, 182 F.R.D. 639 (D. Utah 1998) ............................................................. 6

*Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608 (S.D. Fla. 2009) .................................. 7

*Facebook, Inc. v. Duguid*, No. 19-511, 2021 WL 1215717 (U.S. Apr. 1, 2021) .......................... 1

*Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549 (N.D. Ill. Mar. 2, 2016) ..................................................................................................................................... 9, 13

*Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 193560 (E.D. Mo. Jan. 18, 2017) ................................................................................................................................. 22

*Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769 (N.D. Ill. June 22, 2009) .................................................................................................................... 16

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) .................................... 20

*In re Integra Realty Res., Inc.*, 262 F.3d 1089 (10th Cir. 2001) ................................................. 24

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ...................................................................... 19

*In re: Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856 (D. Kan. Sept. 26, 2016) ............................................................................................................. 20

*Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682 (7th Cir. 2013) ..................................... 5

*James v. JPMorgan Chase Bank, N.A.*, No. 8:15-CV-2424-T-23JSS, 2016 WL 6908118 (M.D. Fla. Nov. 22, 2016) ...................................................................................................... 13

*Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013) .............................................. 8

*Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016) ..................................... 6, 15

*Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019) ....................................... passim

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ................................................. 6

*Lary v. Biodesix, Inc.*, No. 19-CV-03006-PAB-NRN, 2020 WL 5513408 (D. Colo. Sept. 14, 2020) ..................................................................................................................................... 21

*Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018) .......................................................................................... passim

*Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366 (D. Utah 2020) ......................... passim

iv

*Lindsay v. Cutters Wireline Serv., Inc.*, No. 17-CV-01445-PAB-SKC, 2021 WL 1172650 (D. Colo. Mar. 29, 2021)................................................................................................. 20

*Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-CV-1290 BEN NLS, 2013 WL 444619 (S.D. Cal. Feb. 5, 2013) ........................................................................................ 13

*Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674 (S.D. Fla. 2013)......... 14, 18

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ..................................................... 18

*McKeage v. TMBC, LLC*, 847 F.3d 992 (8th Cir. 2017)................................................................ 22

*McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017)........................................................................................... 6, 10

*Mey v. Venture Data, LLC*, No. 14-123, Doc. 247 (N.D.W. Va. June 6, 2017) .......................... 22

*Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207 (D. Utah 2019).............................. 24

*Miller v. Basic Rsch., LLC*, 285 F.R.D. 647 (D. Utah 2010).......................................................... 8

*Mohamed v. Am. Motor Co., LLC*, 320 F.R.D. 301 (S.D. Fla. 2017) .......................................... 13

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)......................................... 17, 20, 21

*Munday v. Navy Fed. Credit Union*, 2016 WL 7655807 (C.D. Cal. 2016) ........................... 10, 14

*N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020) ................................... 13

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014)............................................ 13

*Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688 (S.D. Fla. 2015)............ 10, 13, 14, 15

*Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327 (E.D. Wis. 2012) ........ 14, 15

*Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807 (S.D. Fla. June 26, 2018)............................................................................................... 6, 23

*Rhodes v. Nat'l Collection Sys., Inc.*, No. 15-CV-02049-REB-STV, 2017 WL 4334079 (D. Colo. Apr. 28, 2017) ............................................................................................ 24

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) ............................................. 20, 21

*Rivera v. Exeter Fin. Corp.*, No. 15-CV-01057-PAB-MEH, 2019 WL 6176069 (D. Colo. Mar. 31, 2019).............................................................................................. 20

*Roberts v. C.R. England, Inc.*, 318 F.R.D. 457 (D. Utah 2017) ..................................................... 7

*Rodriguez v. Peak Pressure Control, L.L.C.*, No. 217CV00576JCHJFR, 2020 WL 3000415 (D.N.M. June 4, 2020) ........................................................................................... 20

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016) ................. 19, 22

*Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329 (5th Cir. 2019) .......................... 19

*Shook v. El Paso Cty.,* 386 F.3d 963 (10th Cir. 2004) ................................................................. 20

*Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442 (N.D. Ohio 2012) ..... 16

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) ........................................ 13

*Ulibarri v. Southland Royalty Co., LLC*, No. 1:16-CV-215 RB-JHR, 2019 WL 1473079 (D.N.M. Apr. 3, 2019) ............................................................................................. 20

*West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) .............................................. 6

**Statutes**

47 U.S.C. § 227 ............................................................................................................................. 1

**Other Authorities**

Daniel Luks, *Ascertainability in the Third Circuit: Name That Class Member*, 82 Fordham L. Rev. 2359 (2014) ..................................................................................................... 21

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................... 5, 20

**Treatises**

Newberg on Class Actions § 3.3 (5th ed.) ................................................................................. 21

### Request for Relief

Brandi Wesley respectfully requests that this Court certify her proposed Prerecorded or Artificial Voice Class (the "proposed class"),[1] which she defines as: "All persons throughout the United States (1) to whom Snap Finance LLC placed, or caused to be placed, a call, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Snap Finance LLC accountholder, (3) in connection with which [Snap Finance LLC] used an artificial or prerecorded voice, (4) from February 27, 2016 through the date of class certification." ECF No. 40, ¶ 34. Ms. Wesley also requests that this Court appoint her as the representative for the proposed class, and appoint Greenwald Davidson Radbil PLLC as counsel for the proposed class.

### The Telephone Consumer Protection Act

"Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2343 (2020) (Kavanaugh, J.). Against this backdrop, the Telephone Consumer Protection Act ("TCPA") makes it "unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).[2]

---

[1]      In light of the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), Ms. Wesley does not currently seek to certify her proposed Automatic Telephone Dialing System Class or her proposed Text Message Class.

[2]      Because the TCPA prohibits, absent prior express consent, calls made by using "any automatic telephone dialing system *or* an artificial or prerecorded voice," 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added), Snap's use of an artificial or prerecorded voice is a basis for liability separate from any use of an automatic telephone dialing system. *See Facebook*, 141 S. Ct. 1163 at 1173 ("The statute separately prohibits calls using 'an artificial or prerecorded voice'. . . . Our decision today does not affect that prohibition.)." Ms. Wesley, of course, alleges that Snap violated the TCPA "by using an artificial or prerecorded voice in connection with calls it placed

**Statement of Relevant Facts**

In August 2019 Derrick Jackson, a/k/a Derrick Johnson, entered into a lease-to-own agreement with Snap Finance LLC ("Snap") for a set of automobile tires. *See* SNAP_7-14, attached as Exhibit A; Foster Transcript (Rule 30(b)(6) deposition), attached as Exhibit B, at 23:1-20; 27:24-28:2; 37:12-23. Months later, Snap began to place calls and deliver text messages to Ms. Wesley's cellular telephone number—to which she has been the sole subscriber since November 2016, *see* Wesley Transcript, attached as Exhibit C, at 105:10-12; 108:9-12; 137:20-21; 146:1-2— "in an effort to reach Mr. Jackson about missed payments on his account with Snap." *See* Snap's Answer to Interrogatory No. 5, attached as Exhibit D; Foster Transcript at 67:6-14.

More specifically, from November 2019 through February 2020, Snap used InContact's Max-Version 540af5c dialer to place no less than 102 calls to Ms. Wesley's cellular telephone number. *See* Snap's Answers to Interrogatory Nos. 2, 5; Snap's Response to Request for Production No. 4, attached as Exhibit E; SNAP_15, attached as Exhibit F; Christensen Transcript (Rule 30(b)(6) deposition), attached as Exhibit G, at 49:11-14; 50:1-11; 79:2-5; 134:14-17. In connection with these 100-plus calls to Ms. Wesley's cellular telephone number Snap delivered at least 20 prerecorded voice messages. *See* SNAP_15; Wesley Transcript at 157:14-21; 158:1-16; Christensen Transcript at 63:23–64:23; 77:3-18.

Each of Snap's calls to Ms. Wesley's cellular telephone number was intended for Mr. Jackson. *See* Snap's Answers to Interrogatory Nos. 5, 14; Foster Transcript at 67:6–68:12. Ms. Wesley, however, does not know Mr. Jackson. *See* Wesley Transcript at 140:21–141:21. And she did not give Mr. Jackson permission to use her cellular telephone number. *See id.* at 146:11-13.

---

to [her] cellular telephone number and the cellular telephone numbers of the members of the Prerecorded or Artificial Voice Class without consent." ECF No. 40 at 13, ¶ 67.

As well, Snap has no relationship with Ms. Wesley. *See* Foster Transcript at 68:16–69:4. Snap does not have an account it associates with Ms. Wesley. *See* Snap's Answer to Interrogatory No. 6; Foster Transcript at 18:3-15; 24:18-22; 30:22–31:2. And at no point did Ms. Wesley provide Snap with consent to place calls to her cellular telephone number by using an autodialer or a prerecorded voice. *See* Foster Transcript at 71:10–76:3.

On a number of occasions Ms. Wesley answered Snap's calls and was greeted with a prerecorded voice. *See* Wesley Transcript at 154:18–155:19. That is, "[w]hen [Ms. Wesley] answered [Snap's] calls, there was not an agent on the line. It was an automated message advising it was Snap Finance calling, and it provided a phone number to return the call. . . . [T]here was never an option to press zero or anything that would allow [Ms. Wesley] to connect with an agent." *Id.* at 242:4–243:10; 173:14-21; *accord* Christensen Transcript at 142:8-24; SNAP_18 (click here to listen to Snap's prerecorded message).

In February 2020 Ms. Wesley placed a return call to Snap "[t]o notify [it] that [it] was calling a number that was a wrong number, and to ask that the calls stop." *See* Wesley Transcript at 173:4-13; 174:2-13; SNAP_17 (click here to listen to the recording of the conversation between Ms. Wesley and Snap); Foster Transcript at 65:8-12; Christensen Transcript at 30:5-13; 35:2-3. Snap's internal note following Ms. Wesley's call reads: "ibc who Brandy westley cx called in stating that we always call her & She does not know who we are & she stated that we have been calling her since 11/20/19 & she never has time to answer & she called us back & stated if we can please not call her phone number . . . . 6823." SNAP_4, attached as Exhibit H.

But even after Ms. Wesley informed Snap it was placing calls to a wrong number, and that it should stop doing so, Snap called and texted Ms. Wesley's cellular telephone number. *See* Wesley Transcript at 153:15–154:1; *compare* Plaintiff_39-41 and Plaintiff_51-52, attached as

Exhibit I, *with* Snap's Answer to Interrogatory No. 17, attached as Exhibit J, and Snap's Answer to Interrogatory No. 21 and Snap's Answers to Request for Admission Nos. 1-4, attached as Exhibit K. Of note, Ms. Wesley is not alone in her experience with Snap.

To be sure, from September 2019 through August 2020 Snap used the InContact dialer to place 27,221,892 calls to 357,372 cellular telephone numbers. *See* Snap's Amended Answer to Interrogatory Nos. 7, 9-11, attached as Exhibit L; Saucedo Transcript (Rule 30(b)(6) deposition), attached as Exhibit M, at 21:1-5; 35:13-18. This means that Snap—which employs approximately 120 call center representatives, *see* Christensen Transcript at 40:25–41:3—used the InContact dialer to place approximately 75,000 calls per day from September 2019 through August 2020.

Of the 357,372 cellular telephone numbers to which Snap placed calls by using the InContact dialer, Snap marked 52,141 of them with a "wrong number" notation.[3] *See* Snap's Amended Answer to Interrogatory No. 9; SNAP_20, attached as Exhibit N;[4] Saucedo Transcript at 33:17-20; 35:13-18. In other words, of the 357,372 cellular telephone numbers to which Snap placed calls by using the InContact dialer from September 2019 through August 2020, Snap was informed that 52,141 of them were wrong numbers. *See* Snap's Amended Answer to Interrogatory No. 9; Christensen Transcript at 88:20–89:5; 92:2-8; 95:1-5.

And of the 52,141 cellular telephone numbers to which Snap placed calls by using the InContact dialer and marked with a "wrong number" notation, Snap delivered prerecorded voice messages to 32,780 of them. *See* Snap's Feb. 22, 2021 Letter, attached as Exhibit O; SNAP_70,

---

[3]     Snap's records for telephone numbers may contain "a 'Wrong Number' attribute or a 'Wrong Number – Do Not Call' attribute," and "[t]he attribute 'Wrong Number – Do Not Call' appears on SNAP_00000020 as 'Do Not Call.'" *See* Snap's Amended Answer to Interrogatory No. 9. Ms. Wesley refers to these attributes as "wrong number" notations.

[4]     SNAP_20, as well as SNAP_70, SNAP_184, and SNAP_61 are excerpts of voluminous spreadsheets, which Ms. Wesley truncated and excerpted for purposes of this filing.

attached as Exhibit P. In all, Snap delivered 479,687 prerecorded voice messages to the 32,780 cellular telephone numbers to which it placed calls by using the InContact dialer and marked with a "wrong number" notation. *See id*.

Also, from March 2016 through September 2019 Snap used a 3CLogic dialer to place 57,588,366 calls to 1,078,817 cellular telephone numbers. *See* Snap's Feb. 22, 2021 Letter; SNAP_184, attached as Exhibit Q; Goel Declaration, attached as Exhibit R. Of these 1,078,817 cellular telephone numbers, Snap marked 76,662 with a "wrong number" notation. *See* Snap's Feb. 22, 2021 Letter; SNAP_61, attached as Exhibit S.

Snap cannot determine to how many of the 76,662 cellular telephone numbers—to which it placed calls by using the 3CLogic dialer from March 2016 through September 2019 and marked with a "wrong number" notation—it delivered prerecorded voice messages. *See* Christensen Transcript at 99:3-6; 105:5-19; 107:5-9; 115:3-6. But given that during the proposed class period Snap placed twice as many calls by using the 3CLogic dialer than it did by using the InContact dialer, and that Snap marked nearly 50% more cellular telephone numbers to which it placed calls by using the 3CLogic dialer with a "wrong number" notation than it did cellular telephone numbers to which it placed calls by using the InContact dialer, a reasonable assumption is that Snap delivered prerecorded voice messages during the proposed class period by using the 3CLogic dialer to about 50,000 cellular telephone numbers it marked with a "wrong number" notation.

### Standard

Under Federal Rule of Civil Procedure 23, the party seeking class certification must first demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative plaintiff are typical of the claims or defenses of the class; and (4) the representative plaintiff will

fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). The party seeking

certification must then show—as applicable to this matter—that questions of law or fact common

to the members of the class predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for the fair and efficient adjudication

of the controversy. *See* Fed. R. Civ. P. 23(b)(3).

## Argument

As Judge Easterbrook wrote: "Class certification is normal in litigation under [the TCPA],

because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v.

Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *accord Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643,

656 (4th Cir. 2019) ("Given the remedial purpose of the TCPA, it is no surprise that its cause of

action would be conducive to class-wide disposition.").

And this remains true for "wrong number" TCPA classes like this one. *See, e.g.*, *Knapper

v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019) (certifying a "wrong number" TCPA class

over objection); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807

(S.D. Fla. June 26, 2018) (same); *Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-

00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018) (same); *West v. Cal. Servs. Bureau, Inc.*,

323 F.R.D. 295 (N.D. Cal. 2017) (same); *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501 (S.D.

Ind. 2016) (same); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) (same);

*accord McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764 (N.D.

Cal. Sept. 6, 2017) (certifying two "non-debtor" TCPA classes over objection).

## I. Ms. Wesley satisfies the requirements of Rule 23(a).

### A. The proposed class is so numerous that joinder of all members is impracticable.

"Rule 23(a)(1) imposes a burden upon plaintiffs seeking to represent a class to establish

that the class is so numerous as to make joinder impracticable." *Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366, 373 (D. Utah 2020) (Shelby, J.).[5] "To satisfy that burden, a plaintiff must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Id*. at 373. It is not, however, necessary to identify the exact number of class members involved; rather, common sense assumptions may support a finding of numerosity. *Ditty v. Check Rite, Ltd.*, 182 F.R.D. 639, 641 (D. Utah 1998) (Campbell, J.). Moreover, "[r]ecognizing that no precise number satisfies [the numerosity] requirement, courts have observed that a class in excess of one hundred is usually sufficient." *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 504 (D. Utah 2017) (Shelby, J.).

Here, during the proposed class period "Snap place[d] calls to individuals located in most of the 50 states." Christensen Transcript at 12:1-5. In doing so, Snap used the InContact dialer to deliver prerecorded voice messages to 32,780 cellular telephone numbers it marked with a "wrong number" notation. *See supra* Statement of Facts. Ms. Wesley's cellular telephone number is one of these 32,780 cellular telephone numbers. As well, a reasonable assumption is that during the proposed class period Snap used the 3CLogic dialer to deliver prerecorded voice messages to another 50,000 cellular telephone numbers it marked with a "wrong number" notation. *See id*. Accordingly, even though all recipients of the prerecorded voice messages are not *necessarily* class members, numerosity is satisfied. *See Lavigne*, 2018 WL 2694457, at *3-4 (finding a proposed "wrong number" TCPA class satisfied numerosity where "Defendants' own call logs . . . identify 38,125 separate phone numbers (both landline and cell phone) that called in, [and] were coded as 'Bad/Wrong Number,'" and explaining that "[e]ven if only a fraction of the approximately 38,125

---

[5]     Unless otherwise indicated, all internal citations and quotation marks are omitted.

are in fact class members, the numerosity requirement here is readily satisfied.").[6] And this is true even without taking into account the estimated 3CLogic data.

### B. Questions of law and fact are common to members of the proposed class.

"To satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must demonstrate that there are questions of law or fact common to [the] class." *Lawrence*, 336 F.R.D. at 374. This means that "class members' claims must depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. "A single common question may satisfy this requirement." *Id*. Unremarkable, then, is that "[t]he threshold of commonality is not high. . . . [T]he rule requires only that resolution of the common questions affect all or a substantial number of the class." *Dilley v. Acad. Credit, LLC*, No. 2:07CV301DAK, 2008 WL 4527053, at *3 (D. Utah Sept. 29, 2008) (Kimball, J.). Furthermore, "[f]actual differences between class members' claims do not defeat certification where common questions of law exist." *Miller v. Basic Rsch., LLC*, 285 F.R.D. 647, 653-54 (D. Utah 2010) (Stewart, J.).

Here, whether Snap used a prerecorded voice in connection with the calls at issue is a question common to the proposed class. *See Knapper*, 329 F.R.D. at 242 ("Whether Defendant used a[] . . . prerecorded voice to allegedly call the putative class members would produce an answer that is central to the validity of each claim in one stroke.").[7] Additionally, that each member

---

[6]     *See also Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608, 614-15 (S.D. Fla. 2009) (finding a proposed class to be sufficiently numerous where the number of class members was an unknown subset of 30,139 individuals, and noting that it was reasonable to assume that fifty of the "tens of thousands" of people the defendant called were class members).

[7]     *See also Cortes v. Nat'l Credit Adjusters, L.L.C.*, No. 216CV00823MCEEFB, 2020 WL 3642373, at *4 (E.D. Cal. July 6, 2020) ("Here, the case presents the common legal issue of whether Defendant used . . . [a] prerecorded voice message to make unsolicited calls regarding a purported debt. This issue is common to all putative class members and thus, the commonality

of the proposed class suffered the same injury and is entitled to the same statutorily mandated relief gives rise to another common question. *See id.* ("[A]ll putative class members allegedly suffered the same injury—a receipt of at least one phone call by Defendant in violation of the TCPA. Thus, whether each class member suffered the same injury is also a 'common contention.' . . . Therefore, commonality is satisfied.").[8] What's more, whether liability attaches to wrong number calls is a question common to the proposed class. *See id.* (finding that "whether liability attaches for wrong or reassigned numbers" would "produce an answer that is central to the validity of each claim in one stroke").

### C.   Ms. Wesley's claims are typical of the claims of the members of the proposed class.

"Under Rule 23(a)(3), a plaintiff must demonstrate that her claims . . . are typical of the claims . . . of the class." *Lawrence*, 336 F.R.D. 366, 375. "[L]ike commonality, typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless

---

requirement is met."); *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 328 (W.D. Okla. 2018) ("Core allegations require determination of a number of common questions of fact and law, including: (1) whether the soundboard/avatar files used in the calls qualify as a 'prerecorded voice' prohibited by the TCPA[.]"); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 251 (N.D. Ill. 2014) ("Those who are members of one of the proposed classes by definition received the same calls . . . made by . . . using the same artificial or prerecorded voice technology. This is a common alleged injury presenting a common question."); *Cabrera v. Gov't Emps. Ins. Co.*, No. 12-61390-CIV, 2014 WL 11894430, at *3 (S.D. Fla. Sept. 29, 2014) (finding that "common questions . . . apt to drive the resolution of the case, includ[e] (1) whether [the defendant] placed the calls at issue; [and] (2) whether it did so using a[] . . . prerecorded or artificial voice"); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 104 (N.D. Ill. 2013) (finding as questions "common to the class . . . (2) whether [the defendant's] dialer delivers pre-recorded messages").

[8]     *See also Lavigne*, 2018 WL 2694457, at *4 ("Plaintiff identifies a number of common questions of law or fact: . . . • whether the class suffered the same injury, receipt of call in violation of the TCPA."); *Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016) ("Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone."); *Birchmeier*, 302 F.R.D. at 251 ("Those who are members of one of the proposed classes by definition received the same calls . . . made by or for one of the defendants, using the same artificial or prerecorded voice technology. This is a common alleged injury presenting a common question[.]").

of any class member's individual circumstances." *Id.* "But the typicality requirement does not require that every member of the class share a fact situation *identical* to that of the named plaintiff. Rather, this requirement is met so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Id*. at 375-76.

Here, Ms. Wesley and members of her proposed class were similarly harmed by Snap's common practice of delivering prerecorded voice messages to wrong numbers. Ms. Wesley, therefore, possesses the same interests, and seeks the same relief, as do members of her proposed class. *See generally* ECF No. 40. Correspondingly, Ms. Wesley's claims are typical of the claims of members of her proposed class. *See Cortes*, 2020 WL 3642373, at *5 ("Here, Plaintiff asserts the same claims that could be brought by any of the other class members, specifically that Defendant used an . . . artificial or prerecorded voice message to make unsolicited calls regarding a purported debt. Therefore, the typicality requirement is satisfied.").[9]

As well, that the calls Snap placed to Ms. Wesley and members of her proposed class—in connection with which Snap delivered prerecorded voice messages—were wrong-number calls makes Ms. Wesley's claims typical of the claims of members of her proposed class. *See Knapper*, 329 F.R.D. at 242-43 ("The Court finds that the typicality requirement is met. Here, Plaintiff is a not a customer of Defendant and alleges that Defendant did not have consent to call her before it dialed her phone number. . . . She alleges that the putative class members were also wrongly

---

[9]     *Accord Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 696 (S.D. Fla. 2015) ("[T]he proposed class representative satisfies the typicality requirements because Plaintiff, like each of the class members, was purportedly sent the same fax and each class member's claim is based on the same legal theory and same set of facts as Plaintiff's claim."); *Cabrera*, 2014 WL 11894430, at *4 ("The Court finds that Plaintiff's claims are typical of the proposed cellular-only class because his claims arise from the same practice—[the defendant's] use of LiveVox to place calls to cellular numbers—and are premised on the same TCPA violation."); *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 690 (S.D. Fla. 2014) (finding typicality in a TCPA matter where the named plaintiff received the same communication as did members of the class).

contacted by Defendant. . . . Thus, the nature of Plaintiff's claim is reasonably coextensive with the putative class members.").[10]

### D. Ms. Wesley and her counsel will fairly and adequately protect the interests of members of the proposed class.

"Rule 23(a)(4) requires a class representative to fairly and adequately protect the interests of the class." *Lawrence*, 336 F.R.D. at 377. "This requirement factors in competency and conflicts of class counsel and requires: (1) the class representative and their counsel to not have any conflicts of interest with other class members, and (2) the class representative and their counsel to prosecute the action vigorously on behalf of the class." *Id.*

#### 1. Ms. Wesley will continue to fairly and adequately protect the interests of members of the proposed class, and she has no conflicts with them.

Prior to this matter Ms. Wesley had neither initiated a lawsuit, nor been sued. *See* Wesley Transcript at 14:20-23; 37:2-38:11. Nonetheless, when questioned by counsel for Snap, Ms. Wesley demonstrated knowledge of the TCPA and this matter. *See id.* at 72:2-17; 85:11-86:8. Moreover, Ms. Wesley effectively testified regarding her responsibilities as a class representative. *See id.* at 78:22-79:9. And, to date, Ms. Wesley has taken to heart her role and responsibilities as a class representative. *See, e.g.*, Declaration of Brandi Wesley, ¶¶ 4-10, attached as Exhibit T.

Furthermore, Ms. Wesley made clear that she seeks the same relief—nothing more and

---

[10]    *See also Lavigne*, 2018 WL 2694457, at *5 ("Moreover, both the Plaintiff and putative class members are in the same factual situation. The proposed class is narrowly tailored to include individuals who called in to GC services to report that Defendants were calling the wrong person and coded as "Bad/Wrong Number"[.] . . . The proposed class is therefore most likely factually identical to Plaintiff."); *McMillion*, 2017 WL 3895764, at *7 ("Additionally, with respect to Perez, . . . he, like the members of the Non-Debtor classes, never had a debt collection account with Rash Curtis. Accordingly, the Court finds that Perez has satisfied Rule 23(a)(3)'s typicality requirement."); *Munday v. Navy Fed. Credit Union*, 2016 WL 7655807, at *4 (C.D. Cal. 2016) (finding typicality satisfied where "[Plaintiff]—like members of the putative class—was called on his cellular telephone by Navy Federal, with an [automatic telephone dialing system], between October 9, 2011 through the present and the call was coded as a 'wrong number'.").

nothing less—for herself as she does for members of the proposed class. *See* Wesley Transcript at 34:3-11; 35:10-13; 81:10–82:7; 83:18–84:11. And Ms. Wesley made clear that she can and will serve as a class representative in this matter. *See id*. at 85:3-10. Finally, Ms. Wesley knows of no conflicts with members of the proposed class. *See id*. at 236:14–237:5.

### 2. Ms. Wesley's counsel will continue to fairly and adequately protect the interests of members of the proposed class, and they have no conflicts with them.

Ms. Wesley retained counsel experienced and competent in class action litigation, including under the TCPA. *See* Radbil Declaration, attached as Exhibit U, ¶¶ 9-11. Indeed, courts have not only appointed Ms. Wesley's counsel as class counsel in dozens of consumer protection class actions in the past few years alone, but many have also taken care to highlight Ms. Wesley's counsel's wealth of experience and skill. *See id*., ¶¶ 12-20. And Ms. Wesley's counsel has, and will continue to vigorously protect the interests of members of the proposed class. *Id*., ¶¶ 42-46.

## II.  Ms. Wesley satisfies the requirements of Rule 23(b).

### A. The questions of law and fact common to members of the proposed class predominate over any questions affecting only individual class members.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation and asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Lawrence*, 336 F.R.D. at 382. "To determine if class issues predominate over individual issues, the court *characterize*[*s*] the issues in the case as common or not, and then *weigh*[*s*] which issues predominate." *Id*. "This is done by considering how the class intends to answer factual and legal questions to prove its claim—and the extent to which the evidence needed to do so is common or individual." *Id*.

Relevant, then, is that "[t]o state a cause of action under the TCPA, a plaintiff must allege

(1) that the defendant called the plaintiff's cellular telephone (2) using an ATDS or an artificial or prerecorded voice (3) without the plaintiff's prior express consent." *Asher v. Quicken Loans, Inc.*, No. 2:17-CV-1203, 2019 WL 131854, at *1 (D. Utah Jan. 8, 2019) (Parrish, J.).[11] Given as much, "the predominant issue common to all class members is whether Defendant used an . . . artificial or prerecorded voice message to make unsolicited calls . . . in violation of the TCPA[,] [and] any individualized factual questions are predominated by the common question of Defendant's general TCPA liability." *Cortes*, 2020 WL 3642373, at *5.[12]

Also significant, individualized issues of prior express consent that may exist in some TCPA class actions do not exist here. In short, members of the proposed class are unintended recipients of Snap's prerecorded voice messages, who necessarily did not provide Snap with prior express consent to place calls to their cellular telephone numbers. And because all of the claims at

---

[11]     Prior express consent is an affirmative defense that a TCPA defendant must plead and prove. *See Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1226 (D.N.M. 2019) ("A defendant may raise the plaintiff's express consent to the telephone call as an affirmative defense."); *Chavez v. Advantage Grp.*, 959 F. Supp. 2d 1279, 1281 (D. Colo. 2013) ("The burden of proof is on defendant to establish that plaintiff expressly consented to be contacted at her cell phone number.").

[12]     *See also Gehrich*, 316 F.R.D. at 226 (noting that "[t]he common questions listed above [including whether the defendant placed prerecorded or automated calls and alerts to cellular telephone numbers] are the main questions in this case, they can be resolved on a class-wide basis without any individual variation, and they predominate over any individual issues"); *accord Mohamed v. Am. Motor Co., LLC*, 320 F.R.D. 301, 316 (S.D. Fla. 2017) ("whether [a defendant] used an automated telephonic dialing system to [place the subject calls] and caused injuries to the class members is an issue that predominates over those that may be considered individualized"); *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-CV-2424-T-23JSS, 2016 WL 6908118, at *1 (M.D. Fla. Nov. 22, 2016) ("Also, the class satisfies Rule 23(b)(3)'s predominance requirement. Class-wide proof can answer the predominant questions (whether Chase auto-dialed each person and whether each call violates the TCPA)."); *Palm Beach Golf Ctr.-Boca, Inc.*, 311 F.R.D. at 699 (explaining that "[t]he facts necessary to establish liability [under the TCPA] relate to Defendant's common course of conduct and the transmissions of the [communications]," and finding that "common issues predominate over any individual issues that may arise"); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-CV-1290 BEN NLS, 2013 WL 444619, at *4 (S.D. Cal. Feb. 5, 2013) ("The central inquiry is whether Wells Fargo violated the TCPA by making calls to the class members.").

bar stem from wrong-number calls to non-customers, issues relating to prior express consent do not bear on this matter. *See N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1166 (9th Cir. 2020) ("Credit One's intent to call a customer who had consented to its calls does not exempt Credit One from liability under the TCPA when it calls someone else who did not consent.").[13]

And even if issues regarding prior express consent existed, common issues would still predominate. *See Palm Beach Golf Ctr.-Boca, Inc.*, 311 F.R.D. at 699 ("The Court agrees with the Court in *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 338 (E.D. Wis. 2012), *aff'd*, 704 F.3d 489 (7th Cir. 2013), that any issues relating to whether any of the recipients gave permission to receive faxes prior to transmission or whether any of the plaintiffs had an established business relationship with the defendant can be handled within the framework of a class action.").[14]

Moreover, in a wrong-number TCPA class action, issues related to "wrong number" notations—assuming their existence, for the sake of argument—do not defeat predominance:

> Defendants also argue that this litigation will devolve into individualized issues . . . . They assert that a call could be coded "Bad/Wrong Number" for many reasons unrelated to the fact that a third party was called. Initially, a number of courts have rejected this theory in "Wrong Number" cases, under similar factual circumstances, at the class certification stage. *See Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501, 503 (S.D. Ind. 2016); *Munday*, 2016 WL 7655807, at *4; *Abdeljalil*, 306 F.R.D. at 309 (rejecting argument that class is not ascertainable because notation in account

---

[13]    *See also Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251-52 (11th Cir. 2014) ("one can consent to a call only if one has the authority to do so, and only the subscriber . . . can give such consent"); *Soppet v. Enhanced Recovery Co.*, LLC, 679 F.3d 637, 641 (7th Cir. 2012) ("Customer could consent expressly to receive calls at his *current* Cell Number, even if that number changes, but simply providing Creditor with a number . . . does not authorize perpetual calls to that number after it has been reassigned to someone else.").

[14]    *See also Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 689 (S.D. Fla. 2013) ("Common questions of law and fact predominate here because, as explained above, any persons who may have been subject to an individualized consent defense were excluded during numerosity discovery."); *Abdeljalil*, 306 F.R.D. at 311 (rejecting the defendant's argument that prior express consent defeated predominance in connection with a TCPA "wrong-number" class, and finding that "plaintiff has met his burden of demonstrating that questions of fact and law predominate over individualized issues").

for "bad number" does not necessarily mean that number belonged to non-account holder); *West v. California Servs. Bureau, Inc.*, 2017 WL 6316823, at *4 (N.D. Cal. 2017) ("Defendant does not persuade. As an initial matter, several district courts have deemed commonality and predominance satisfied in TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in defendant's call log databases 'may not have actually been a wrong number.'").

*Lavigne*, 2018 WL 2694457, at *8.

Additionally, other potential issues—such as "difficult damage calculations, individual determinations of who the telephone user was, when the call was made and proof that [the defendant] actually made the calls . . . difficult[y] [in] determining the identity of users . . . [and] the distinct possibility that every record marked as a wrong number may not have actually been a wrong number"—do not stand in the way of a finding of predominance. *See Johnson*, 315 F.R.D. at 502 (certifying a "wrong-number" TCPA class, and rejecting the defendant's contention that individual issues would "overwhelm the litigation and destroy the required commonality of facts").

## B. A class action is superior to other available methods for the fair and efficient adjudication of this matter.

"In addition to its predominance requirement, Rule 23(b)(3) requires a plaintiff to show that a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy." *Lawrence*, 336 F.R.D. at 385. "There are four, non-exhaustive factors relevant to this inquiry: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claim in the particular forum; and (D) the likely difficulties in managing a class action." *Id*.

From the outset, litigating TCPA claims as part of a class action is generally superior to litigating them in successive individual lawsuits. *See Reliable Money Order, Inc.*, 281 F.R.D. at

339 ("[M]any courts have found class actions to be an appropriate method of adjudication of TCPA violations.").[15] This is, in part, because no one member of a TCPA class has an interest in controlling the prosecution of the action. Here, for example, this is true because the claims of members of the proposed class are identical, they arise from the same standardized conduct, and they result in uniform damages calculated on a per-prerecorded voice message basis:

> The Court is persuaded that putative class members who would ultimately become part of the class would have little incentive to prosecute their claims on their own. Should individual putative class members choose to file claims on their own, given the potential class size and the relatively small amount of statutory damages for each case, individual litigation would not promote efficiency or reduce litigation costs. This is particularly so for claims that all stem from the same cause of action and involve common issues. Therefore, the Court finds that a class action is a superior method to adjudicate this matter.

*Knapper*, 329 F.R.D. at 247.[16]

Also important, absent a class action, thousands of claims like Ms. Wesley's—all of which stem from Snap's identical conduct—will go un-redressed. *See Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 446 (N.D. Ohio 2012) ("Under the TCPA, each individual plaintiff is unlikely to recover more than a small amount (the greater of actual monetary loss or $500). Individuals are therefore unlikely to bring suit against [the defendant], which makes a class action the superior mechanism for adjudicating this dispute.").[17] Indeed, as the court in

---

[15] *See also Palm Beach Golf Ctr.-Boca, Inc.*, 311 F.R.D. at 699 ("[T]he Court finds that a class action is superior to other methods for adjudicating the putative class members' TCPA claims.").

[16] *See also Lavigne*, 2018 WL 2694457, at *8 ("[T]he complex nature of this TCPA action lends itself to the efficiencies of class certification. It would [be] inefficient to reinvent [the] wheel on approximately 30,000 separate cases.").

[17] *See also Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *3 (N.D. Ill. June 22, 2009) ("[R]esolution of the issues [under the TCPA] on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both

*Custom Hair Designs by Sandy, LLC v. Cent. Payment Co., LLC* explained:

> As Judge Posner once stated, "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). The same principle applies in this case. The amount of damages allegedly is over $100,000 million dollars. The damages for these two plaintiffs are approximately $200.00. A class action seems to be the superior method of challenging the actions of the defendant. There is no other way for the plaintiffs to address CPAY's alleged behaviors.

No. 8:17CV310, 2020 WL 639613, at *8 (D. Neb. Feb. 11, 2020).

Additionally, there are unlikely to be serious difficulties in the management of this case as a class action.[18] To be sure, Snap produced documents identifying the cellular telephone numbers to which it delivered prerecorded voice messages during the proposed class period, as well as the name of each customer it intended to reach by delivering prerecorded voice messages to the cellular telephone numbers at issue. *See supra* Statement of Facts; SNAP_20. And based on this information the names and addresses of individuals associated with the cellular telephone numbers to which Snap delivered prerecorded voice messages and marked with a "wrong number" notation can be identified in a practical and efficient manner. *See* Peak Declaration at ¶¶ 11-17, 19-23, attached as Exhibit V; *accord Brown v. DirecTV, LLC*, 330 F.R.D. 260, 273-74 (C.D. Cal. 2019) (certifying a TCPA class action and discussing the use of the defendant's internal wrong number

---

judicial and party resources."); *Abdeljalil*, 306 F.R.D. at 312 ("This Court finds this case, in which 'damages suffered by each putative class member are not large,' is appropriate for class certification.").

[18]    Even if manageability concerns did exist, failure to certify a class action under Rule 23(b)(3) solely on manageability grounds is disfavored. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015) ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members. District courts have considerable experience with and flexibility in engineering solutions to difficult problems of case management . . . . Under this comparative framework, refusing to certify on manageability grounds alone should be the last resort."), *cert. denied*, 136 S. Ct. 1161 (2016).

notations to identify potential class members).[19]

A class action, therefore, is the superior method to adjudicate this controversy. *See Manno*, 289 F.R.D. at 690 ("In addition, the Court finds that the large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that [a] class action would be the superior method of adjudicating the plaintiffs' claims under the . . . TCPA.").

**III.    The proposed class is ascertainable.**

**A.  Ms. Wesley is not required to show at the class certification stage that there is an administratively feasible means of identifying absent class members; rather, she must simply show that her proposed class definition is based on objective criteria.**

"Although the United States Court of Appeals for the Tenth Circuit has not explicitly discussed the requirement that the members of a class be ascertainable, several circuit and district courts recognize that the members of a class must be ascertainable under Federal Rule of Civil Procedure 23." *Banks v. Cent. Refrigerated Servs., Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056, at *4 (D. Utah May 2, 2017) (Kimball, J.). Circuit courts, however, do not unanimously agree on what is required for a class to be ascertainable.

On the one hand, the Third Circuit requires—or at one time required[20]—that to demonstrate

---

[19]    *See also Knapper*, 329 F.R.D. at 244-46 (discussing the viability of reverse number lookup processes to identify potential class members for notice purposes); *West*, 323 F.R.D. at 302 (same); *Birchmeier*, 302 F.R.D. at 254 (rejecting an argument that the class was not manageable because it would allegedly be either impossible, or costly and onerous, to obtain the identities of the subscribers for the phone numbers of 930,000 class members).

[20]    Almost immediately after the Third Circuit set forth its heightened ascertainability standard, Judge Ambro—who authored the standard in *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012)—began to chip away at it. *See Carrera v. Bayer Corp.*, No. 2-08-cv-04716, 2014 WL 3887938, at *2-3 (3d Cir. May 2, 2014) (Ambro, J., dissenting from denial of rehearing *en banc*). Subsequently, in reversing a district court's denial of class certification based

ascertainability "a plaintiff [must] show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). In other words, the Third Circuit engrafted a freestanding administrative feasibility prerequisite onto Rule 23. Courts refer to this as a "heightened ascertainably" standard.

On the other hand, the Second, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have declined to adopt a heightened ascertainability standard. That is, they chose not to engraft a freestanding administrative feasibility prerequisite onto Rule 23. *See Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) ("We hold that administrative feasibility is not a requirement for certification under Rule 23."); *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) ("[T]his court has not adopted that heightened standard."); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("We have never interpreted Rule 23 to require [a separate administrative feasibility prerequisite], and, like the Sixth, Seventh, and Eighth

---

on ascertainability grounds, the Third Circuit clarified that "ascertainability only requires the plaintiff to show that class members can be identified." *Byrd*, 784 F.3d at 165. Notably, through a concurring opinion in *Byrd*, Judge Rendell not only stated that given "the lengths to which the majority goes in its attempt to clarify what our requirement of ascertainability means, and to explain how this implicit requirement fits in the class certification calculus . . . the time has come to do away with this newly created aspect of Rule 23," but also refuted each of the rationales offered in defense of a heightened ascertainability standard and concluded that the requirement "contravenes the purpose of Rule 23 and . . . disserves the public." *Id.* at 172, 175-77 (Rendell, J., concurring). And after that, the Third Circuit took an opportunity to rebuff one of the very premises on which its now heavily criticized heightened ascertainability standard rests. *See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 67 F.3d 434, 440 (3d Cir. 2017) ("Plaintiff need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership. Rule 23 does not require an objective way of determining class membership at the certification stage, but only that there be objective criteria for class membership and a reliable and administratively feasible means of determining whether these criteria are met. . . .The conclusion that affidavits in combination with [the defendant's] database categorically failed to meet the ascertainability standard was inconsistent with these precedents."). So even in the Third Circuit a heightened ascertainability standard is on shaky ground.

Circuits, we decline to do so now."); *In re Petrobras Sec.*, 862 F.3d 250, 267 (2d Cir. 2017) ("conclud[ing] that our [prior precedent] did not create an independent administrative feasibility requirement"); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (declining to recognize a "separate, preliminary" requirement and, instead, "adher[ing] to a rigorous analysis of the Rule 23 requirements"); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) ("We see no reason to follow [the Third Circuit's heightened ascertainability standard], particularly given the strong criticism it has attracted from other courts."); *Mullins*, 795 F.3d at 672 ("[W]e decline . . . to adopt a heightened ascertainability requirement.").

Accordingly, as far as the majority of circuit courts are concerned,[21] the focus of

---

[21]        At least one district court in this this circuit predicted that the Tenth Circuit will follow the approach of the Second, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits in rejecting a heightened ascertainability standard. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550, at *10-11 (D. Kan. Mar. 10, 2020) ("The court . . . predicts that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of Rule 23 requiring certification movants to satisfy the more stringent ascertainability standard adopted by the Third Circuit. Instead, the court predicts that our Circuit would follow the Seventh Circuit's approach, applying the less restrictive ascertainability test on certification."). And this is not surprising as "it appears that the Tenth Circuit considers ascertainability as part of the Fed. R. Civ. P. 23(b)(3) inquiry." *Lavigne*, 2018 WL 2694457, at *6 (citing *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004)). What's more, a number of district courts in this circuit have sided with the clear circuit court majority in finding that ascertainability requires only that the class definition not be vague, that the class not be defined by subjective criteria, and that the class not be defined in terms of success on the merits. *See, e.g.*, *Lindsay v. Cutters Wireline Serv., Inc.*, No. 17-CV-01445-PAB-SKC, 2021 WL 1172650, at *2 (D. Colo. Mar. 29, 2021) (holding that "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria"); *Lary v. Biodesix, Inc.*, No. 19-CV-03006-PAB-NRN, 2020 WL 5513408, at *2 (D. Colo. Sept. 14, 2020) ("The Court finds that this is an ascertainable class. It is ascertained by reference to objective criteria, namely, a four year time period, the receipt of fax advertisements, and the classification of the member in a certain group, such as lack of consent or lack of business relationship. None of these metrics are subjective, and it is simple to determine who is in the putative class."); *Rodriguez v. Peak Pressure Control, L.L.C.*, No. 217CV00576JCHJFR, 2020 WL 3000415, at *12 (D.N.M. June 4, 2020) ("Defendants contend that the class is not ascertainable. Although not expressly a requirement of Rule 23, most courts imply a requirement that a class definition be precise, objective, and presently ascertainable. Moreover, it appears that the Tenth Circuit considers ascertainability as part of the Fed. R. Civ. P. 23(b)(3) inquiry. . . . Class members can be readily identified by objective criteria

ascertainability is on "the adequacy of the class definition itself," not "on whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Mullins* 795 F.3d at 659.[22] It therefore follows that "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304. More precisely, a class is ascertainable where its definition is (1) not amorphous or imprecise, but clearly defined, (2) not limited by subjective criteria, but rather objective criteria, and (3) not a fail-safe class, or one defined in terms of success on the merits. *See Mullins*, 795 F.3d at 659-60.

Here, the proposed class definition is not vague. Instead, it identifies a particular group of individuals (non-customers of Snap) harmed in a particular way (they received prerecorded voice

---

based on Defendants' business records of putative class members' employment with Defendants. Ascertainability is met."); *Ulibarri v. Southland Royalty Co., LLC*, No. 1:16-CV-215 RB-JHR, 2019 WL 1473079, at *5 (D.N.M. Apr. 3, 2019) ("Though not an explicit requirement under Rule 23, an important element of class certification is that the potential class members can be objectively and easily ascertained. A class may be ascertainable when its members may be identified by reference to objective criteria."); *Rivera v. Exeter Fin. Corp.*, No. 15-CV-01057-PAB-MEH, 2019 WL 6176069, at *3 (D. Colo. Mar. 31, 2019), *reconsideration denied,* No. 15-CV-01057-PAB-MEH, 2019 WL 6173666 (D. Colo. Nov. 19, 2019), and *aff'd,* 829 F. App'x 887 (10th Cir. 2020) ("An identifiable class exists if its members can be ascertained by reference to objective criteria"); *In re: Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856, at *2-3 (D. Kan. Sept. 26, 2016) ("The Court is persuaded by the thorough and well-reasoned analysis of the Seventh Circuit in *Mullins*. Thus, it declines Syngenta's invitation to apply a standard—one not adopted by the Tenth Circuit—that would preclude certification without a showing that class members may be determined in an administratively feasible manner.").

[22]     *See also Briseno*, 844 F.3d at 1124 (affirming the district court's holding that "it was sufficient that the class was defined by an objective criterion"); *Rikos*, 799 F.3d at 525 (explaining that "for a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria," and further noting that "we considered—and rejected—the defendants' claim that the class properly could [not] be certified without . . . 100% accuracy"); *accord* Daniel Luks, *Ascertainability in the Third Circuit: Name That Class Member*, 82 Fordham L. Rev. 2359, 2369 (2014) ("Ascertainability has traditionally been defined as the existence of a class whose members can be identified by reference to objective criteria in the class definition."); Newberg on Class Actions § 3.3 (5th ed.) ("courts essentially focus on the question of whether the class can be ascertained by objective criteria").

messages from Snap on their cellular telephones) during a specific period of time (February 27, 2016 through the date of class certification). The proposed class definition is not limited by subjective criteria. For example, it is not defined as "persons frustrated by Snap's prerecorded voice messages." And the proposed class is not defined by way of language that would create a fail-safe class, such as "all persons who have a valid TCPA claim against Snap." So if Snap prevails on the merits, *res judicata* will bar members of the proposed class from re-litigating their claims. Accordingly, the proposed class is ascertainable.

**B.**  **Even if Ms. Wesley were required to show that there is an administratively feasible means of identifying absent class members—she is not—she is able to do so.**

Numerous courts have made clear in the context of TCPA class actions that call logs identifying telephone numbers to which the calls in question were placed constitute objective criteria that make a class ascertainable. *See, e.g.*, *McKeage v. TMBC, LLC*, 847 F.3d 992, 999 (8th Cir. 2017) ("We identified the 'fax logs showing the numbers that received each fax' as 'objective criteria that make the recipient clearly ascertainable.'").[23]

Here, Snap produced spreadsheets that identify cellular telephone numbers it marked with a "wrong number" notation and to which it delivered at least one prerecorded voice message. *See*

---

[23]  *See also Sandusky Wellness Ctr., LLC*, 821 F.3d at 997 ("[F]ax logs showing the numbers that received each fax are objective criteria that make the recipient clearly ascertainable."); *Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) ("[T]he record in fact demonstrates that the fax numbers are objective data satisfying the ascertainability requirement."); *Braver*, 329 F.R.D. at 334 ("A list of telephone numbers that fall within the class definition satisfies the ascertainability requirement."); *Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 193560, at *2 (E.D. Mo. Jan. 18, 2017) (finding a TCPA class "sufficiently ascertainable" based on list of telephone numbers); *Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 442 (E.D. Mich. 2015) (finding a TCPA class "sufficiently ascertainable" because "Plaintiff possesses a list of numbers to which the fax was sent, and it is certainly feasible to determine which individuals and businesses received the faxes at those numbers"); *accord Mey v. Venture Data, LLC*, No. 14-123, Doc. 247 at 26 (N.D.W. Va. June 6, 2017) (certifying a TCPA class, and pointing out that "numerous reliable databases exist from which a class administrator can accurately identify names and addresses based on a list of telephone numbers").

*supra* Statement of Facts. These spreadsheets also reference the number of prerecorded voice messages Snap delivered to each respective cellular telephone number. As well, Snap is able to identify for any particular cellular telephone number on the spreadsheets the date and time of each prerecorded voice message it delivered to the cellular telephone number. *See* Christensen Transcript at 55:3-13; 64:8–65:9. So without more, the proposed class is ascertainable even if a showing of ascertainability requires an administratively feasible means of identifying absent class members at the class certification stage, which it does not:

> [T]he Court agrees with [the plaintiff] that she has presented an administratively feasible method of identifying class members. Although "B" flags or "WN" notations may not incontrovertibly establish that [the defendant] dialed a wrong number, and thus would not conclusively establish who is a class member, that fact does not defeat class certification because [the plaintiff] is not proposing to rely solely on [the defendant's] records to identify class members. Rather, those notations would represent a *starting point* from which [the plaintiff] can further define the class through the methods described by her expert, including the use of self-identifying affidavits and subpoenas.
>
> That method would be consistent with *Karhu*. [The plaintiff] is not "establish[ing] ascertainability simply by asserting that class members can be identified using [the defendant's] records." 621 F. App'x at 946. Rather, [the plaintiff] is saying that those "records are in fact useful for identification purposes" because they narrow the potential class. *Id.* Moreover, there is no indication that, in this particular case, self-identification through affidavits is not administratively feasible or "otherwise problematic." *Id.*

*Reyes*, 2018 WL 3145807, at *13-14; *accord Braver*, 329 F.R.D. 334-35 ("apply[ing] a standard of ascertainability which requires: first, that the class be defined with reference to objective criteria; and second, a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition," and finding that "[a]scertainability requirements are satisfied" by the "list of telephone numbers that fall within the class definition").

## IV.   Ms. Wesley's proposed notice plan satisfies Rule 23(c)(2)(B).

Rule 23(c)(2)(B) requires delivery of the "best notice that is practicable under the

circumstances, including individual notice to all members who can be identified through reasonable effort." "Nevertheless, this due process right does not require *actual* notice to each party intended to be bound by the adjudication of a representative action." *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005).[24]

Here, Ms. Wesley—by way of a court-approved notice and claims administrator—will send court-approved notice to potential class members by direct mail. *See* Peak Declaration, ¶¶ 21-23. In addition, she will create a dedicated website. *See id.*, ¶ 24. Ms. Wesley will also issue notice by internet and traditional publication, ensuring that as many potential class members as possible receive notice of this class action and are apprised of their rights. *See id.*, ¶¶ 19-20.

Individuals receiving notice then must determine whether they are *bona fide* class members affected by this case so they can decide whether to stay in the case or exclude themselves from it. Then, should there ultimately be a judgment in favor of the class, class members who wish to recover will be able to attest to receiving prerecorded voice messages, and, if necessary, submit supporting documentation such as telephone records. That is, for example, class members will be able to identify themselves by way of a sworn statement made in connection with a claim form should the class prevail on the merits. *See Briseno*, 844 F.3d at 1132 (explaining that the need for self-identification and related discovery from absent class members, if necessary, does not disturb a defendant's due process rights, and noting that "there is no due process right to a *cost-effective* procedure for challenging every individual claim to class membership").[25]

---

[24]     *See also Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1225 (D. Utah 2019) (Parrish, J.) ("In the Tenth Circuit, actual receipt of notice is not necessary, so long as the 'best practicable notice' was given to the absent class members."); *accord In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110-11 (10th Cir. 2001) (finding Rule 23 and Due Process satisfied where the record indicated that only seventy-seven percent of class members actually received notice).

[25]     *See also, e.g.*, *Rhodes v. Nat'l Collection Sys., Inc.*, No. 15-CV-02049-REB-STV, 2017

In the end, this method of class notice and class member participation is industry standard in TCPA class actions like this one. *See Bonoan v. Adobe Inc.*, No. 3:19-CV-01068-RS, 2020 WL 6018934, at *2 (N.D. Cal. Oct. 9, 2020) (analyzing a notice plan proposed by Ms. Wesley's expert, which is materially indistinguishable from the plan she proposes in connection with this matter, and finding: "The proposed notice and method for notifying the settlement class members of the settlement and its terms and conditions meet the requirements of Rule 23(c)(2)(B) and due process, constitute the best notice practicable under the circumstances, and constitute due and sufficient notice to all persons and entities entitled to the notice.").

## Conclusion

"The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr*, 140 S. Ct. 2335 at 2343. But it is not only the people's representatives who are fighting back against these ubiquitous, annoying calls. The people—like Ms. Wesley here—are too. And as Chief Justice Roberts said of the TCPA during the oral argument in *Barr*: "It's an extremely popular law. Nobody wants to get robocalls on their cell phone."[26] With this in mind, Ms. Wesley respectfully requests that this Court certify the proposed class, appoint her as the representative for the proposed class, and appoint Greenwald Davidson Radbil PLLC as counsel for the proposed class.

---

WL 4334079, at *2 n.4 (D. Colo. Apr. 28, 2017) (characterizing as "appropriate" the "submission of self-identifying affidavits, subject as needed to audits and verification procedures and challenges, to identify class members.").

[26]   Transcript of Oral Argument (May 6, 2020), at 40:20-22, http://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/19-631_omjp.pdf.

Dated: April 16, 2021

*/s/ Aaron D. Radbil*
Aaron D. Radbil
Alexander D. Kruzyk
GREENWALD DAVIDSON RADBIL
PLLC
401 Congress Avenue, Suite 1540
Austin, Texas 78701
Phone: (512) 803-1578
aradbil@gdrlawfirm.com
akruzyk@gdrlawfirm.com

Michael L. Greenwald
GREENWALD DAVIDSON RADBIL
PLLC
7601 North Federal Highway, Suite A-230
Boca Raton, Florida 33487
Phone: (561) 826-5477
mgreenwald@gdrlawfirm.com

Jason E. Greene
Jared D. Scott
ANDERSON & KARRENBERG, P.C.
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Phone: (801) 534-1700
jgreene@aklawfirm.com
jscott@aklawfirm.com

*Counsel for Ms. Wesley and the proposed class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2021, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will provide notice to all counsel of record. I also certify that on April 26, 2021, I caused to be mailed a copy of the foregoing by U.S. mail to Derrick Deon Jackson, Jr. a/k/a Derrick Johnson:

1600 Pecan Chase Circle, Apt. 9
Arlington, Texas 76012

*/s/ Aaron D. Radbil*
Aaron D. Radbil