# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **BRANDI WESLEY, on behalf of herself and others similarly situated,** | |
| **Plaintiff,** | **Case No.:  2:20-cv-00148-RJS-JCB** |
| **v.** | **Chief Judge Robert J. Shelby** |
| | **Magistrate Judge Jared C. Bennett** |
| **SNAP FINANCE LLC,** | |
| **Defendant.** | |
| **SNAP FINANCE LLC,** | |
| **Third-Party Plaintiff,** | |
| **v.** | |
| **DERRICK DEON JACKSON, JR., A/K/A DERRICK JOHNSON,** | |
| **Third-Party Defendant.** | |

**EXPERT REPORT OF MARGARET A. DALEY**

         C O N F I D E N T I A L

# Table of Contents

I.     SUMMARY OF OPINIONS ............................................................................. 4

   A.  Plaintiff Has Failed To Identify Any Class Members And Relies Solely On A Faulty "Notification Plan" To Be Employed After Class Certification .................................. 4

   B.  Third-Party Reverse Lookup Vendors, Including PacificEast, Associate Multiple People With The 6823 Number At The Same Time ................................................................... 4

   C.  Ms. Peak's Methodology Is Incomplete And Cannot Be Tested For Accuracy ................. 5

   D.  Ms. Peak Offers No Opinion On The Reliability Of Her Methodology, And Has Not Done Any Of The Testing Needed To Support Such A Claim ............................................ 5

   E.  "Wrong Number" Designations Do Not Accurately Identify Calls Placed To Non-Customers Without Consent ................................................................................................. 6

   F.  My Analysis Of A Sample Set Of 500 Telephone Numbers With A "Wrong Number" Or "Wrong Number -Do Not Call" Designation Revealed 92.6% of Telephone Numbers Identified as "Wrong Numbers" Can Actually Be Excluded from Class Consideration ............ 7

   G.  Reverse Cellular Lookup Data Is Highly Inaccurate And Unreliable ................................. 8

   H.  Plaintiff Offers No Reliable Method To Identify And Remove Customer Names From Any Proposed List Of Potential Class Members ........................................................... 8

II.    QUALIFICATIONS .......................................................................................... 8

III.   DOCUMENTS CONSIDERED .................................................................... 11

IV.   FACTUAL BACKGROUND ......................................................................... 11

   A.  Snap Finance ............................................................................................................... 11

   B.  The Snap Finance Dialing and Texting Designations ...................................................... 14

   C.  The Problem Of Reassigned Numbers ............................................................................. 15

   D.  The Telephone Calls To The 6823 Number ..................................................................... 16

   E.  The Class Allegations ....................................................................................................... 18

   F.  The Declaration Of Carla Peak ......................................................................................... 18

V.    ANALYSIS AND CONCLUSIONS ............................................................. 19

   A.  Plaintiff Has Failed To Identify Any Class Members And Relies Solely On A Faulty "Notification Plan" To Be Employed After Class Certification ................................. 19

   B.  Third-Party Reverse Lookup Vendors, Including PacificEast, Associate Multiple People With The 6823 Number At The Same Time ................................................................. 21

   C.  Ms. Peak's Methodology Is Incomplete And Cannot Be Tested For Accuracy ............... 24

   D.  Ms. Peak Offers No Opinion On The Reliability Of Her Methodology, And Has Not Done Any Of The Testing Needed To Support Such A Claim .......................................... 28

E.   "Wrong Number" Designations Do Not Accurately Identify Calls Place To Non-Customers Without Consent ........................................................................................ 30

F.   My Analysis Of A Sample Set Of 500 Calls With A "Wrong Number" Or "Wrong Number - Do Not Call" Designations Revealed 92.6% Can Be Excluded from Class Consideration ............................................................................................................ 33

G.   My Analysis Of A Sample Set Of 500 Telephone Numbers With A "Wrong Number" or "Wrong Number - Do Not Call" Designations Revealed At Least 92.6% of the 500 Would Be Excluded from any Potential Class And The Remaining 7.4% Are Not Reliably Identified ... 36

    *i.*    **Selection and Filtering of the Sample Data** ................................................. 36

    *ii.*    **Reverse Lookups** ................................................................................... 37

    *iii.*    **A Note on No-Appends** .................................................................... 40

    *iv.*    **Account Level Review** ........................................................................ 41

    *Some Telephone Numbers With "Wrong Number" or "Wrong Number - Do Not Call" Designations May Not Have Received A Call or Text* ........................................... 42

    *Manual And Time-Intensive Analysis Of The Account Records Is Necessary* ...................... 43

    *Manual and Time-Intensive Analysis Of The MessageMedia Text Data Is Necessary* ......... 45

    *"Wrong Number" and "Wrong Number - Do Not Call" Designations Do Not Exclusively Refer to Bona Fide "Wrong Number" Calls* ........................................................ 48

    *"Wrong Number" and "Wrong Number - Do Not Call" Designations May Not Correctly Identify Account Holder Name or Identify All Authorized Users* ......................................... 49

    *Relying Only On Name Associations May Result In Overlooking Caller ID Name Matches* 51

    *A "Wrong Number" or "Wrong Number - Do Not Call" Designations May Indicate Contact With Another Snap Finance Customer* ................................................... 51

    *In Summary* ................................................................................................. 52

H.   Reverse Cellular Lookup Data Is Highly Inaccurate ........................................... 53

    i.    The Sources of Data Used by Reverse Lookup Services ............................ 54

    ii.    Different Data Vendors Return Different Results For The Same Telephone Number .. 54

    iii.    Reverse Lookup Data Vendors Do Not Purport To Offer Accurate Results .............. 56

    iv.    I Have Tested And Confirmed That Reverse Cellular Directory Data Vendors, Including PacificEast And LexisNexis, Provide Inaccurate Results ..................................... 56

I.   Plaintiff Offers No Reliable Method To Identify And Remove Customer Names From Any Proposed List Of Potential Class Members ....................................................... 60

J.   CONCLUSION ............................................................................................. 62

## I.   SUMMARY OF OPINIONS

### A.   Plaintiff Has Failed To Identify Any Class Members And Relies Solely On A Faulty "Notification Plan" To Be Employed After Class Certification

1.  Ms. Peak does not offer any expert opinion that the class members can be identified in advance of class certification. She does not identify or demonstrate any methodology that identifies any class member besides the Plaintiff. Plaintiff Brandi Wesley offers no plan or process through which the telephone numbers that received true "wrong number" calls or texts can be identified. Plaintiff Brandi Wesley has not identified any class members outside of herself.

### B.   Third-Party Reverse Lookup Vendors, Including PacificEast, Associate Multiple People With The 6823 Number At The Same Time

2.  The methodology proposed by Ms. Peak for class *notification* is not suited to class *identification*. By way of illustration, Plaintiff Brandi Wesley alleges in her complaint that she received telephone calls from Snap Finance between November 6, 2019 and February 7, 2020.[1] Yet Ms. Wesley's self-attestation is necessary to associate her with her telephone number on any of the dates when these calls were placed. Ms. Peak claims that her proposed reverse look-up methodology returned the Plaintiff Brandi Wesley as the current named user but fails to disclose the significant errors and omissions found in the PacificEast record upon which she relies, including information that directly contradicts the Plaintiff's own testimony.

---

[1] Amended Class Action Complaint at ¶ 9.

## C.  <u>Ms. Peak's Methodology Is Incomplete And Cannot Be Tested For Accuracy</u>

3.  Ms. Peak did not attempt to test her proposed methodology on any of the data produced in the case, and her declaration provides little to no detail on critical aspects of how she proposed to implement the process. It is therefore necessary to draw conclusions about her and Plaintiff's expectations based on other sources. Some of these gaps can be filled by reference to her work in *Head v. Citibank*, for which she submitted a substantially similar declaration outlining the same proposed methodology. Consequently, Ms. Peak's deposition in *Head v. Citibank* provides insight into many aspects of the sparsely described "notice" plan she outlined. Most importantly:

    a.  She expresses no opinion on whether the class should be certified or whether actual class members can be identified.[2]

    b.  Her opinion is limited to whether she could provide notice *after* the class is certified.[3]

    c.  She admitted that a manual review of account notes is needed in order to remove persons that consented to be called.[4]

## D.  <u>Ms. Peak Offers No Opinion On The Reliability Of Her Methodology, And Has Not Done Any Of The Testing Needed To Support Such A Claim</u>

4.  Ms. Peak presents no evidence and does not opine that class members can be reliably and efficiently identified using the methodology outlined in her report. She has conducted no testing on the vendor data she proposes to use, and has never conducted the process before. Ms. Peak does not describe any experience or qualifications using

---

[2] *Head v. Citibank,* Deposition of Carla Peak, Attached as Exhibit 1, pp. 114, 139.
[3] *Id*, p. 132.
[4] *Id*, pp. 69, 89, 101-102, 144, 152, 153, 262-263.

public record vendors, and it is evident from her report that she has made several mistaken assumptions about the availability, integrity, and consistency of the source data needed for her methodology. Based on my knowledge and experience in using reverse lookup records, comparing their results to account-level documentation and other records that accurately identify the user of a telephone number at a given point in time I know that reverse lookup data is highly unreliable. Using unreliable reverse lookup data to identify purported class members will result in a highly inaccurate class list.

E.  "Wrong Number" Designations Do Not Accurately Identify Calls Placed To Non-Customers Without Consent

5.  My analysis demonstrates that the "Wrong Number" and "Wrong Number - Do Not Call" designations are not a reliable indicator of which users *actually* received wrong number calls. These designations were used by customer service agents to designate numbers that should be removed from outbound communications for a variety of reasons, including situations where the telephone number was still used by the customer. In my granular examination of the sample data, I have identified examples where these designations were applied to telephone numbers answered by the customer, by a joint accountholder such as a spouse, by authorized contacts and by other family members. In order to identify cellular numbers that received "wrong number" calls, a manual review of the customer account records is needed to determine if consent to place the so called "wrong number" call existed.

6.  It is also critical to note that the records only contain designations of "Wrong Number" and "Wrong Number - Do Not Call" for calls placed on or after June 2, 2017, but the

proposed class period begins on March 6, 2016, four years prior to the date the complaint was filed, leaving fifteen months of the proposed class period with no representative data. Additionally, the "Wrong Number" and "Wrong Number - Do Not Call" records pertain to telephone calls, whereas Plaintiff offers no mechanism by which to identify which text message recipients claimed to be "wrong numbers."

**F. <ins>My Analysis Of A Sample Set Of 500 Telephone Numbers With A "Wrong Number" Or "Wrong Number -Do Not Call" Designation Revealed 92.6% of Telephone Numbers Identified as "Wrong Numbers" Can Actually Be Excluded from Class Consideration</ins>**

7.   In order to test Plaintiff's assumptions and evaluate the efficacy of Ms. Peak's proposed methodology, I conducted a thorough and detailed analysis of a set of sample records produced by Snap Finance to determine if class members could be identified. Put simply, if Plaintiff were correct that the "Wrong Number" and "Wrong Number - Do Not Call" designations reliably identify non-customers, and that reverse lookup information reliably identifies the users of telephone numbers, then one would expect the vast majority of a sample of numbers designated as "wrong numbers" to be associated with non-customers. The opposite is true. In my analysis of a random sample of 500 cellular telephone numbers designated in Snap Finance's "Snap App" system as "Wrong Number" or "Wrong Number - Do Not Call," a substantial majority of these numbers are reported by reverse lookup data vendors as being used by Snap customers on the date of the alleged wrong number calls. Additional telephone numbers can be excluded from a potential class based on details identified in Account Notes, Call Log Data and Text Message Data.

### G. Reverse Cellular Lookup Data Is Highly Inaccurate And Unreliable

8. The poor performance of Ms. Peak's methodology in my analysis is expectedly not surprising. The information provided by reverse lookup services is inherently affected by significant errors and omissions in the source records. In my capacity as an investigator with decades of professional experience using public records data vendors, I am keenly aware of the limitations inherent in these data sources. None of the third-party vendors selling "reverse cellular lookup" name associations provide reliable and accurate data. Relying on this inaccurate data can only produce an error ridden list of purported "class members."

### H. Plaintiff Offers No Reliable Method To Identify And Remove Customer Names From Any Proposed List Of Potential Class Members

9. Ms. Peak does not explain how she intends to remove Snap Finance's customers from any proposed class list. In my experience, the only way to perform this filtering in an automated way is to employ complex name matching software. Typically, such an undertaking involves the selection of name matching software for the particular level of accuracy required for the task at hand. Ms. Peak has no experience in conducting name matching analysis but has previously testified that the selection of one name matching program and one set of tolerances over another would substantially alter the composition and accuracy of her proposed class list.[5] I am unable to analyze and opine as to the reliability of this part of the methodology as Ms. Peak does not disclose how it will be conducted.

## II.     QUALIFICATIONS

---

[5] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 250.

10. I am a Managing Director of Berkeley Research Group ("BRG") and a leader in its Global Investigations + Strategic Intelligence practice group. BRG is a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation and regulatory support, authoritative studies, strategic advice, and data analytics to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. [6]

11. I specialize in leading forensic technology investigative teams that work on complex databases housing sophisticated financial, transactional, and compliance related data. I have personally conducted thousands of background investigations during the last twenty years, and have used data provided by data vendors such as TransUnion (TLO), PacificEast and LexisNexis for the purpose of actually identifying persons associated with telephone numbers during specific historical time periods. I have used this information to assist in the location of witnesses and in background investigations of parties, as well as in internal investigations relating to fraud, trade secret theft, and data breaches. I have been involved as an expert witness in a Telephone Consumer Protection Act ("TCPA") case where independent third-party surveys were conducted to determine if persons identified in historical records as the owner of a telephone number received the calls at issue in the case.

12. I have personally conducted accuracy testing on multiple occasions of the historical reverse cellular lookup reported by PacificEast, LexisNexis, and TransUnion.

---

[6] My Curriculum Vitae details my previous work history and qualifying credentials and is attached hereto as Exhibit 2.

13. I have previously been retained, as either a confidential consulting expert or a testifying expert, in over fifty lawsuits alleging violations of the TCPA and have been qualified as an expert witness by numerous courts. I was retained in those cases, among other things, to investigate whether data sources—dialer records, account records and publicly available data—could be used to identify the persons who received dialer calls and/or to determine whether there was evidence in the consumer records relating to consent to call the number at issue. I have also been engaged in TCPA lawsuits to assist in the identification of potential class members so that class administrators can provide notice in connection with the settlement of such lawsuits. I have analyzed billions of rows of dialer data from a variety of dialing system platforms and conducted and overseen the manual reviews of tens of thousands of customer service call records, marketing lead lists, web logs, customer account systems of records, financial records and banking account notes. Multiple courts have relied on my work in their decisions regarding class certification motions.

14. As a part of my work in those cases I have undertaken extensive manual reviews of customer service notes associated with debt collection calls made by major national banks such as Wells Fargo, for automobile credit lenders, mortgage lenders, and student loan servicers such as Navient Solutions and Sallie Mae.

15. In addition to the manual review of thousands of individual consumer records associated with debt collection calls, I have also performed data analysis on structured databases to determine if consumers that previously were identified by the debt servicer as revoking consent to be contacted later provided their lender with consent to be contacted. I have also undertaken reviews of the status of consent associated with

individual consumers in structured databases to determine if such status is reliable when compared to the individual records of customer communications such as customer service notes and call recordings.

16. I have been retained by counsel for Snap Finance LLC and I am being compensated at the hourly rate of $675.

## III.   DOCUMENTS CONSIDERED

17. My understanding of the factual matters at issue is based on my review of the documents and data described below.[7] I understand that additional information relevant to my opinions may be disclosed in subsequent productions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

## IV.   FACTUAL BACKGROUND

### A.  Snap Finance

18. Defendant Snap Finance LLC (hereinafter "Snap" or "Snap Finance") services rental purchase agreements entered into by consumers for the lease of, and option to purchase, goods such as computers, mattresses, tires, electronics, furniture and jewelry.[8]

19. I understand that Snap Finance obtains telephone numbers from customers in the normal course of business, including through lease applications at the point of sale at a retailer, the Snap Finance website, or conversations with agents. The lease application requests

---

[7] The list of documents and data relied upon is attached hereto as Exhibit 3.
[8] https://snapfinance.com/how-it-works

contact information, including cellular telephone numbers, so that Snap may communicate with the customer regarding their account.[9]

20. I have been advised that Snap only communicates with customers on cellular telephone numbers that are provided to it by its customers. It is the policy of Snap Finance not to dial or text account holders' cellular telephone numbers unless they have provided express prior consent. This express consent can be documented in a variety of places, including the terms and conditions in its lease applications, the communication consent provisions in the rental purchase agreements, and notes made by customer service agents during call with customers.

21. Snap business records pertinent to each customer account may include account records (including customer service notes, collection notes, account/customer detail, and account status); correspondence; lease applications; call recordings; and call logs from Snap's telephone dialing systems.

22. I understand that, prior to September 1, 2019, Snap Finance used the cloud-based contact platform provided by technology vendor 3CLogic to place and receive calls with customers regarding their accounts. Since September 1, 2019, Snap has used a dialing system from vendor inContact. All telephone calls between Snap Finance and Plaintiff Brandi Wesley occurred on the inContact system.[10]

---

[9] The Application Terms and Conditions read, in part: "By signing, you give us permission to call the landline or cell phone numbers provided by you, by automated dialer or otherwise, and to leave voice messages at the phone numbers listed above, disclosing the name of Snap Finance, contact information, and the nature of the call." https://snapfinance.com/consumer-terms-of-use

[10] Defendant Snap Finance LLC's Objections and Responses To Plaintiff's Interrogatories, p.7

23. From time to time Snap communicated with its customers via text. Text communications between Snap and its customers are managed by third party service provider MessageMedia. MessageMedia is the only service provider that sent texts on behalf of Snap to Plaintiff. [11]

24. Dialing and text data from these three vendors have been produced to me with the date limitations set forth in the table below. It is my understanding Snap only has access to 3CLogic call log data between the dates January 2017 to August 31, 2019 and that Snap does not have access to call data before January 2017.  It is my understanding Snap only has access to MessageMedia text data from November 10, 2019 forward.

| Data Source | Earliest Date in Data | Most Recent Date in Data |
|---|---|---|
| 3CLogic WN/WN-DNC Data | 6/2/17 | 8/31/19 |
| inContact WN/WN-DNC Data | 9/1/19 | 9/1/20 |
| MessageMedia Text Data | 11/10/19 | 12/7/20 |

I relied on this dialing and text data to conduct the testing described in this report.[12]

25. Snap Finance obtains consent from its customers to call and text these numbers. I understand that at any point, Snap Finance customers can change their consent on any telephone number associated with their account. Customers can update their consent in the same ways that they can provide telephone numbers, including using the Snap Finance customer webportal or during telephone conversations with agents.

---

[11] Defendant Snap Finance LLC's Objections and Responses To Plaintiff's Interrogatories, p.7.
[12] The designation "Wrong Number-Do Not Call" appears in the 3CLogic and inContact datasets as "Do Not Call."

### B.  The Snap Finance Dialing and Texting Designations

26. On occasion a collection call is connected to a party who represents him or herself to be someone other than the customer. My investigation, which is set forth in the analysis section of this report, revealed that the third party may be related to the customer. For example, family members may answer the call and indicate another number is the customer's preferred contact point. In other circumstances the recipient may in fact be a customer who deliberately misleads Snap regarding their identity because they prefer not to discuss the debt. Sometimes a "wrong number" designation occurs when a customer indicates a different number should be used for contact.

27. Snap Finance agents are trained to accept "wrong number" representations at face value and to delete that number to prevent further contact.

28. I have been advised that, beginning on June 2, 2017, Snap Finance began tracking these requests in the form of attributes agents can select from a drop-down window in SnapApp. Two available attributes are "Wrong Number" and "Wrong Number-Do Not Call." The "Wrong Number" attribute is selected when a representation is made that Snap reached someone other than the intended recipient of the call. The "Wrong Number-Do Not Call" attribute is selected when a representation is made that Snap reached someone other than the intended recipient of the call and a request to stop calling the number is made. Both attributes result in the telephone number being deleted. "Wrong Number" and "Wrong Number - Do Not Call" designations were not applied to any telephone numbers prior to June 2, 2017, and I understand no business records now exist by which to identify which call recipients claimed to be "wrong numbers" prior to that date.

29. The text messaging platform managed by MessageMedia did not use any designations to identify potential "wrong numbers." The text platform was programmed to exclude a number if the recipient replied "Stop." If a text recipient responded with the word "Stop," their number was excluded from the platform and no further texts would be sent.

### C. The Problem Of Reassigned Numbers

30. As set forth below, Plaintiff Brandi Wesley's number ending in 6823 was deliberately provided to Snap Finance by one of its customers, despite the fact that the customer apparently did not use or own that number. It is unclear why this occurred. Calls made by Snap to the 6823 Number resulted because this customer provided this number to Snap. This is a distinct from other types of "wrong number" calls that periodically occur when cellular numbers owned by Snap Finance customers are abandoned and reassigned by their cellular carrier to other people.

31. When customers discontinue their wireless service, they do not always inform creditors such as Snap Finance in a timely manner, or, in some cases, at all. The Federal Communications Commission ("FCC") has recognized this issue and is developing a database of reassigned numbers to help businesses comply with the TCPA in the face of a substantial rate of number reassignment.[13]

32. Snap Finance maintains records regarding the identity of its customers but rarely has any records identifying the recipient of wrong number calls. Where this information does exist, it is buried in an agent's call notes and is not a part of a searchable database.

---

[13] *See* FCC Announcement, attached as Exhibit 4.

33. Many if not most recipients of wrong number calls fail to contact businesses to inform them that a customer number has been reassigned and wrong number call are occurring. It is easier for the users of those reassigned numbers to refuse to answer, or to hang up on calls intended for someone else. When call recipients do inform Snap Finance of a wrong number call, many do not provide their names when they request that Snap cease contacting a particular cellular number. If the person informs a Snap Finance customer service agent of their name during a call, the agent may or may not document the name provided in a call note--their focus is to document the fact of the wrong number call and to delete the cellular number so it can no longer be called. When the name of a wrong number call recipient is documented in the call notes, these names are not separately documented in a column or row subject to an automated search.  Instead, the name is part of free text narrative and would need to be manually reviewed to locate.

34. The customer service note documenting Plaintiff's February 11, 2020 call to Snap Finance is illustrative:

> ibc who Brandy westley cx called in stating that we always call her & She does not know who we are & she stated that we been calling her since 11/20/19 & she never has time to answer & she called us back & stated if we can please not call her phone number 817███6823[14]

### D.  The Telephone Calls To The 6823 Number

35. On August 17, 2019, a person named Derrick Johnson (aka Derrick Jackson) applied for a lease with Snap RTO LLC. Mr. Johnson provided (817) ███-6823 (the "6823 Number") as his cellular number and, as part of the terms and conditions of the application and the terms of the lease expressly consented to be contacted by Snap

---

[14] Deposition of Brandi Wesley, Exhibit 16.

Finance about his account on that number, either by an automated dialing system, artificial or prerecorded voice, or by text.[15]

36. Mr. Johnson failed to make a required lease repayment on November 1, 2019.[16] Snap Finance thereafter attempted to contact Mr. Johnson by calling the 6823 Number that he provided less than two months earlier. In addition to calling the 6823 Number, Plaintiff alleges she received two texts from Snap Finance.[17]

37. Ms. Wesley did not respond to these communications until February 11, 2020, when she called Snap Finance and requested that it cease placing telephone calls to that number. The 6823 Number was subsequently deleted and designated as "Wrong Number -Do Not Contact."

38. Plaintiff Brandi Wesley's complaint alleges that she was the "regular" and "sole user" of the 6823 Number.[18]  In her deposition, she claimed to have started using that number in 2016.[19] Ms. Wesley alleges she does not know Derrick Johnson and that she never consented to receive calls from Snap Finance.[20]

---

[15] Defendant Snap Finance LLC's Objections And Responses To Plaintiff's Interrogatories, p. 10 and 21. *See also* COMMUNICATING WITH YOU; CALL RECORDING:  You authorize us (which for purposes of this Section also includes our affiliates, and their respective service providers, successors and assigns) to use automated telephone dialing, text messaging and e-mail systems to communicate with you at the telephone number(s) and e-mail address(es) you have provided in this Agreement or in any application for a lease with or through us and at any telephone numbers or email addresses that you subsequently provide to us with information relating to this Agreement, your other agreement(s) or account(s) held now or in the future by or through us and other important information regarding your relationship with or through us ("Communications"). Communications might include, for example, messages relating to scheduled or missed payments. You also agree that Communications to your phone may contain prerecorded or artificial voice messages. You understand that Communications to a telephone may be played by a machine automatically when the telephone is answered. SNAP 00000009
16 SNAP 00000003
[17] Deposition of Brandi Wesley, p. 192.
[18] Amended Class Action Complaint, ¶ 7.
[19] Deposition of Brandi Wesley, p. 106.
[20] Deposition of Brandi Wesley, pp. 222-223; Amended Class Action Complaint, ¶ 17.

### E.  The Class Allegations

39. Plaintiff's amended class action complaint seeks to certify the following classes:

> Automatic Telephone Dialing System Class: All persons throughout the United States (1) to whom Snap Finance LLC placed, or caused to be placed, a call, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Snap Finance LLC accountholder, (3) by using InContact Max-Version 540af5c, or a dialing system characterized by 3CLogic Inc. as an "automated dialer," (4) from February 27, 2016 through the date of class certification.

> Prerecorded or Artificial Voice Class: All persons throughout the United States (1) to whom Snap Finance LLC placed, or caused to be placed, a call, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Snap Finance LLC accountholder, (3) in connection with which Defendant used an artificial or prerecorded voice, (4) from February 27, 2016 through the date of class certification.

> Text Message Class: All persons throughout the United States (1) to whom Snap Finance LLC delivered, or caused to be delivered, a text message, (2) directed to a number assigned to a cellular telephone service, but not assigned to a current or former Snap Finance LLC accountholder, (3) by using MessageMedia, or a dialing system characterized by 3CLogic Inc. as an "automated dialer," (4) from February 27, 2016 through the date of class certification.[21]

### F.  The Declaration Of Carla Peak

40. Plaintiff has filed a Declaration by Carla Peak, a self-described "notice expert."[22] Her declaration describes a "notification process" that is to take place *after* class certification and *after* telephone numbers identified as "wrong numbers" have been identified by someone else.

41. Ms. Peak's notice plan starts with her presumption that the parties will produce to her an "ultimate notice list," which she describes as a list of cellular numbers that received

---

[21] Amended Class Action Complaint ¶34.

[22] Declaration of Carla Peak, Attached as Exhibit 4, ¶2. I also observe that the report is titled "Peak Declaration re Notice Procedures_201211.PDF"

wrong number texts and calls. She does not present any opinions regarding how such a list can be accurately compiled. Instead she simply states that she understands that certain cellular numbers contain a "Wrong Number" or "Wrong Number – Do Not Call" attribute, and then says nothing more regarding how to use these attributes and how an "ultimate notice list" would be compiled and presented to her.[23]

42. Ms. Peak then proposes researching the cellular numbers in the "ultimate notice list" through "reverse lookup" services for names data vendors associate with these cellular numbers. She says she would then find current contact information for the names returned by that research and notify them of this lawsuit through a variety of publication efforts.[24]

43. My analysis does not address, and I offer no opinions, regarding the publication aspect of her proposal. My report addresses only the reliability of reverse lookup vendors and whether there is a reliable and automated way to identify cellular numbers that received *bona fide* wrong number calls and texts from Snap Finance.

## V.    ANALYSIS AND CONCLUSIONS

### A.   <u>Plaintiff Has Failed To Identify Any Class Members And Relies Solely On A Faulty "Notification Plan" To Be Employed After Class Certification</u>

44. Ms. Peak does not offer any expert opinion that the class members can be identified in advance of class certification. She does not identify or demonstrate any methodology that identifies any class member besides the Plaintiff.

---

[23] Declaration of Carla Peak, Attached as Exhibit 4, ¶¶ 14 and 16.
[24] *Id*, ¶¶ 4-10.

45. Plaintiff offers no plan or process through which the telephone numbers that received true "wrong number" calls or texts can be identified.

46. Plaintiff offers no method to identify and remove non-class members, such as Snap Finance customers that are associated by the reverse lookup vendors with the cellular numbers they provided to Snap which were subsequently designated with the "wrong number" designations at the time the purported "wrong number" communications took place.

47. Ms. Peak's opinion is limited to her belief that, if she is presented with a list of telephone numbers the parties agree received wrong number calls, she can use reverse lookup data to "find" the class member and provide them with notice of the lawsuit. In a similar lawsuit styled *Head v. Citibank* No.: 3:18-cv-08189-DLR (D. Ariz. 2018), where Ms. Peak and I served as opposing experts, she submitted an almost identical declaration. In that case, in August 2020 Ms. Peak testified that she does not "figure out" which telephone numbers received "wrong number" calls. She expects these numbers to be identified by and agreed to by the parties and then delivered to her.[25] The selection of this list of numbers is "not [her] job."[26]

48. Plaintiff Brandi Wesley has not identified any class members outside of herself.

---

[25] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 131, 156, 158 (noting that she expects to receive from the parties a list of potential class members before her notification process begins).
[26] *Id*, pp. 197-198.

B.  **Third-Party Reverse Lookup Vendors, Including PacificEast, Associate Multiple People With The 6823 Number At The Same Time**

49. The methodology proposed by Ms. Peak for class *notification* is not suited to class *identification*. By way of illustration, Plaintiff Brandi Wesley states in her complaint that she received at least 60 telephone calls from Snap Finance between November 6, 2019 and February 7, 2020.[27] Yet Ms. Wesley's self-attestation is necessary to associate her with her telephone number on any of the dates when these calls were placed.

50. Ms. Peak claims that using her proposed reverse look-up methodology, an unnamed employee of KCC Class Action Services researched the 6823 Number through data vendor PacificEast for a reverse lookup, presumably as some sort of "proof of concept." Ms. Peak's Declaration states the "current name and address returned was for Brandi Wesley, located in Arlington, Texas."[28] This statement is both incomplete and inaccurate.

51. Ms. Wesley testified she first obtained the 6823 Number in November 2016.[29] The complaint states that she is the exclusive user of the 6823 Number.[30]

52. The report that Ms. Peak obtained from PacificEast for the 6823 Number lists *two* distinct users, for dates in 2017, identifying "Amber Sedgwick" as the user as of August 31, 2017, in direct contradiction to the Plaintiff's own statements. Additionally, PacificEast's report for the 6823 number does not provide any association for Ms.

---

[27] Amended Class Action Complaint at ¶ 9.
[28] Declaration of Carla Peak, ¶ 18.
[29] Deposition of Brandi Wesley, p, 104.
[30] Amended Class Action Complaint ¶ 7.

Wesley and that number *on any date* after October 1, 2017, two years before the calls at issue.

53. Reverse look-up data vendors typically provide both a "first seen" and a "last seen" date associating a person with a cellular number. PacificEast failed to report any "last seen" dates for the 6823 Number. BRG inquired about the lack of "last seen" dates in this report and in a December 17, 2020 email to BRG, PacificEast explained that it would not report any "last seen" dates of any person associated with the 6823 number ***because it deemed its own data to be unreliable***:

> Great question on the LastSeen field. LastSeen tends to be the last time a data provider receives the record from a compilation source. This means it could be interpreted as the last date on which a person was known to have been residing at the address. While this may be true for certain providers, for others it indicates the last time they've seen incoming records for that name/address/phone combination.

> Based on our team's analysis, we believe the FirstSeen dates tend to be a much more accurate depiction of a person's association to an address. For example, ***the actual last seen dates on this one record test indicated that multiple different people were all associated with the cell phone at the same time*** [emphasis added]. While that might make sense for a household landline, it doesn't for a wireless number. In situations like this, we don't include a last seen date unless we feel it's helpful in determining when possession of a phone number passed from one person to another.[31] (Emphasis added)

---

[31] Email attached as Exhibit 5.

54. Ms. Peak's statement wrongly implies that the PacificEast results clearly and unambiguously identified Ms. Wesley as the user of the 6823 Number at the time when calls were made by Snap Finance. Her Declaration omits any discussion of these significant errors and omissions. As discussed below, Ms. Peak is aware how unreliable this data is and pointedly provides no opinion that it is accurate or reliable.

55. I personally tested the 6823 Number with three of the most widely used reverse lookup vendors, LexisNexis, TLO and PacificEast. None of the reverse data vendors I tested associate Ms. Wesley with the 6823 Number prior to 2017. Furthermore, each of the data vendors I tested associate *multiple persons* with that number during the period Ms. Wesley claims she used the number exclusively. In addition to PacificEast's identification of "Amber Sedgwick" discussed above, vendor TLO identifies "Raul Ramirez Mondragon" *not* Plaintiff Brandy Wesley, as the user of the 6823 Number at the time the Snap Finance communications took place. None of the data vendors associate Ms. Wesley with the 6823 Number after November 27, 2019 and all report different associations and dates.

56. The chart below reflects the names associated by the three most commonly used reverse data vendors, PacificEast, LexisNexis and TLO with the 6823 Number from 2014 forward. Some vendors report the same name more than once due to spelling differences.

| Third-Party Vendor Reverse Look-up Data For The 6823 Number | | | |
|---|---|---|---|
| **Name** | **Data Vendor** | **First Seen** | **Last Seen** |
| Brandy Wesley | PacificEast | 20171001 | Unreportable |
| Brandi Wesley | PacificEast | 20170930 | Unreportable |
| Amber Sedgwick | PacificEast | 20170831 | Unreportable |
| Raul Rameirez-Mongragon | PacificEast | 20130621 | Unreportable |
| Brandi Wesley | LexisNexis | | |
| E Cardona | LexisNexis | 11/01/2014 | 11/01.2014 |
| Raul Ramirez Mondragon | TLO | 06/28/2013 | 11/02/2020 |
| Brandi R. Wesley | TLO | 01/02/2017 | 06/04/2018 |
| Brandi Wesley | TLO | 06/04/2018 | 11/27/2019 |
| Leungsak Mrugalski | TLO | 05/27/2014 | 05/27/2014 |
| Amber Michelle Sedgwick | TLO | 10/27/2016 | 10/27/2016 |
| Amber M. Sedgewick | TLO | 08/18/2016 | 08/18/2016 |
| E Cardona | TLO | 11/12/2014 | 11/23/2014 |
| Brandi Wesley | TLO | 10/1/2017 | 06/05/2019 |

### C.  **Ms. Peak's Methodology Is Incomplete And Cannot Be Tested For Accuracy**

57. Ms. Peak did not attempt to test her proposed methodology on any of the data produced in the case, and her declaration provides little to no detail on critical aspects of how she proposed to implement the process. It is therefore necessary to draw conclusions about her and Plaintiff's expectations based on other sources. Some of these gaps can be filled by reference to her work in *Head v. Citibank*, for which she submitted a substantially similar Declaration outlining the same proposed methodology. Consequently, Ms. Peak's deposition in *Head v. Citibank* provides insight into many aspects of the sparsely described "notice" plan she outlined. Most importantly:

    a.   She expresses no opinion on whether the class should be certified or whether actual class members can be identified.[32]

    b.   Her opinion is limited to whether she could provide notice *after* the class is certified.[33] In *Head v. Citibank* she expected that someone else would identify the telephone numbers that received "wrong number" calls.[34] Here she appears to suggest that class members can be identified simply by extracting a set of cellular numbers with designations of "Wrong Number" and "Wrong Number – Do Not Call"[35] but she provides no opinion that this would be a reliable or accurate way to identify the class.

    c.   She identifies no methodology to identify the recipient of "wrong number" texts since no "wrong number" designations are used by the MessageMedia texting platform.

    d.   She admitted that a manual review of account notes is needed in order to remove persons that consented to be called.[36]

58. One especially significant aspect of Ms. Peak's proposed methodology that remains unaddressed is what standard she will use when comparing the reverse lookup results to the dates of alleged "wrong number" communications. As discussed above, calls to the Plaintiff's number occurred between November 2019 and February 2020, but the

---

[32] *Head v. Citibank,* Deposition of Carla Peak, Attached as Exhibit 1, pp. 114, 139.
[33] *Id*, p. 132.
[34] *Id*, p. 130-131 (When asked how the telephone numbers that received "wrong number" calls would be identified she testified: "We do not figure that out. The information is provided to us"). *See also* Deposition of Carla Peak, pp. 156-157.
[35] *Wesley v. Snap Finance* Declaration of Carla Peak, ¶ 14.
[36] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 69, 89, 101-102, 144, 152, 153, 262-263.

PacificEast records *only* provide dates of association in 2017. The choice of how to consider the dates of association therefore has the material consequence of either identifying the Plaintiff with her telephone number during the time of the calls—despite no documentary evidence from PacificEast to corroborate that association—or to exclude the Plaintiff from her own class.

59. In Ms. Peak's *Head v. Citibank* Declaration, she stated she would look for name associations "during the period in question."[37] At her deposition she clarified that she would limit the list of potential class members to those persons the data vendor associates with the telephone numbers ***at the time the calls were made***.

> "If information was provided regarding when the phone calls were made and that information could be used to perform the search to limit the date range, then yes, I would recommend that that is our course of action." [38]

60. Ms. Peak's declaration here provides no reference to reverse cellular lookup date associations and comparing them to the date of the Snap Finance customer communications. Her Declaration states that she only looked up the 6823 Number to see if "a name and address would be returned."[39] It is unclear in her Declaration if or why names associated with the cellular number outside of the timeframe of the Snap communications would be considered potential class members by Ms. Peak. As set forth below, my analysis of the data took into consideration her August 2020 testimony that

---

[37] Declaration of Carla Peak, p. 6.
[38] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 194-195 ("If information was provided regarding when the phone calls were made and that information could be used to perform the search to limit the date range, then yes, I would recommend that that is our course of action.")
[39] Declaration of Carla Peak, ¶ 18.

she recommended limiting name associations to the names associated by the reverse lookup data vendors at the time of the Snap Finance communications.

61. This is just one example of the many decision points involved in executing Ms. Peak's proposed methodology where the choice of how to implement the process will have a substantial and material effect on the size and composition of the alleged class.

62. In *Head v. Citibank* Ms. Peak proposed to take all the cellular numbers that the first data vendor fails to associate with a person and send those numbers to a second vendor and "depending upon these results, additional searches may be performed as well by using additional companies."[40] Ms. Peak offers no explanation why records returned by one vendor but not another are reliable, or how to react when different vendors offer contradictory results for the same telephone number. Instead, the goal of her proposed methodology appears to be to keep searching any available source until some name, *any name*, is identified, regardless of the likelihood that the name reported is the actual user.

63. Ms. Peak admitted in her testimony in *Head v Citibank* she might provide notice for as many as 30 names for each telephone number.[41] She does not disclose what she will she do when multiple names are returned for the timeframe of the calls or texts. Since only one person received each communication, the notification of potentially dozens of persons per telephone number will likely result in multiple claims where only one person is a legitimate class member. Ms. Peak does not disclose whether she herself will subjectively decide which claimant is the legitimate class member or if she expects the court to conduct minitrials.

---

[40] *Head v. Citibank*, Declaration of Carla Peak, Attached as Exhibit 6, ¶ 15.
[41] *Id*, p. 189.

### D.  **Ms. Peak Offers No Opinion On The Reliability Of Her Methodology, And Has Not Done Any Of The Testing Needed To Support Such A Claim**

64. Ms. Peak presents no evidence and does not opine that class members can be reliably and efficiently identified using the methodology outlined in her report. She has conducted no testing on the vendor data she proposes to use, and has never conducted the process before.

65. Ms. Peak does not describe any experience or qualifications using public record vendors, and it is evident from her report that she has made several mistaken assumptions about the availability, integrity, and consistency of the source data needed for her methodology. Based on my knowledge and experience in using reverse lookup records, comparing their results to account-level documentation and other records that can corroborate the user of a telephone number at a given point in time, and testing different methods of name matching, I know that the reliability of these records is poor, and frequently lead to the misidentification of calls received by and with the consent of actual customers as supposed "wrong numbers."

66. As of her August 2020 deposition in *Head v Citibank*, Ms. Peak had never tested the accuracy of the reverse lookup data she proposes to use and was unaware of any research regarding their accuracy.[42] She testified in her lifetime she had only reviewed three PacificEast reverse cellular lookup reports. These three reports consisted of the reports on the cellular numbers of the *Head v Citibank* plaintiffs and the report on her own cellular number, which was provided to her at the deposition. PacificEast admittedly

---

[42] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 55.
*See also* Deposition of Carla Peak, p. 163-164, 173 (Noting that she is "hopeful" that the information comes from reliable sources).

failed to associate those plaintiffs with their own cellular numbers and also failed to associate Ms. Peak with her own cellular number, instead identifying someone named Gary Roden and the company "Computershare" as the user of her cellular number.[43]

67. When Ms. Peak realized that PacificEast failed to identify either of the two class representatives (a 100% failure rate),[44] instead of conducting further testing to confirm the reverse lookup data she proposed to use was reliable, she testified she instead was relying on her "hope" that it was accurate.[45] Despite being provided with proof positive that the PacificEast data is highly inaccurate, she continues to propose its use, although she nowhere opines that it is accurate.

68. Ms. Peak has no experience personally conducting the process set forth in her Declarations and she is unable to do it herself as she has no experience or training in pulling and analyzing reverse lookup data; reviewing or analyzing dialer data, analyzing data in structured data platforms such as SQL, analyzing customer account records or performing name matching analysis. She is not a data analytics expert and simply accepts all the data provided to her as correct.

> Q: Have you proposed testing that data to make sure it's right?
>
> Peak: My job is – I don't test data. I don't test that specific data.
>
> Q: But you accept is as correct, right?
>
> A: I accept it – I accept the data.[46]

---

[43] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 195-196, 201, 256.
[44] *Id*, p. 219.
[45] *Id*, p. 173.
[46] *Id*, pp. 51-55, 59, 126, 252

**E.  "Wrong Number" Designations Do Not Accurately Identify Calls Placed To
Non-Customers Without Consent**

69. Ms. Peak's Declaration refers to the use of the "Wrong Number" and "Wrong Number
– Do Not Call" designations but does not opine that numbers with those designations
were in fact called without consent. The production of this list of cellular numbers is a
predicate to her notification process, yet her own prior testimony acknowledges that all
the account records associated with these telephone numbers need to be manually
reviewed for evidence of consent.[47] No automated method of review is possible nor
proposed in her Declaration – it is silent on this point, despite acknowledging the need
for it in *Head v. Citibank.*

70.  A manual review of the account records is required due to the individualized nature of
the communications between Snap Finance and its customers, and the fact that consent
to be contacted may change over time. This complexity is compounded by the fact that
consent documentation can be found in a variety of documentation (lease applications
and agreements, customer service notes, text records, call recordings, emails and
website forms). There is therefore no automated way to identify true "wrong number"
calls absent this individualized review. The "Wrong Number" and "Wrong Number -
Do Not Call" designations were used by Snap Finance agents to designate numbers that
should be deleted for a variety of reasons. They do not exclusively refer to *bona fide*
"wrong number" calls.[48] Reasons for assigning these attributes besides the receipt of a
*bona fide* wrong number include a relative or other authorized person of a Snap customer
answering a Snap customer's telephone number, a Snap customer experiencing a service

---

[47] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 132.
[48] Defendant Snap Finance LLC's Supplemental Responses And Objections To Plaintiff's Interrogatories, pp. 7-8.

interruption, a Snap customer sharing his or her telephone number with a third party, or a Snap customer's mistake or inability to communicate.

71. In *Head v. Citibank* Ms. Peak admitted that such designations may not accurately reflect whether a call was a "wrong number."[49]

72. My investigation of Snap Finance customer records revealed that telephone numbers marked as "Wrong Number" and "Wrong Number - Do Not Call" do not reliably identify calls made without consent to non-customers. It is also critical to note that the records only contain "Wrong Number" and "Wrong Number - Do Not Call" designations for calls placed on or after June 2, 2017, but the proposed class period begins on March 6, 2016, four years prior to the date the complaint was filed, leaving fifteen months of the proposed class period with no representative data.

73. Additionally, the "Wrong Number" and "Wrong Number - Do Not Call" records pertain to telephone calls, whereas Plaintiff offers no mechanism by which to identify which text message recipients claimed to be "wrong numbers."

74. My analysis demonstrates that the "Wrong Number" and "Wrong Number - Do Not Call" designations are not a reliable indicator of which users *in fact* received wrong number calls. These designations were used by customer service agents to designate numbers that should be removed from outbound communications for a variety of reasons, including situations where the telephone number was still used by the customer. In my granular examination of the sample data, I have identified examples where these

---

[49]*Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 151.

designations were applied to numbers likely answered by the customer, by a joint accountholder such as a spouse, by authorized contacts and by other family members

75. This is not to say that Snap Finance does not on occasion reach wrong numbers. Given the rate of reassigned cellular numbers it is impossible not to periodically reach a wrong number. But identifying true wrong numbers is complicated by the fact that many actual "wrong number" calls are never recorded in the dialer data because Snap Finance is not informed that it reached a wrong number. For example, Ms. Wesley waited until she had received dozens of calls and had already contacted a lawyer before she informed Snap Finance that it was reaching a wrong number. Ms. Peak's proposed methodology would result in an "ultimate class list" that would be highly inaccurate because "Wrong Number" and "Wrong Number – Do Not Call" designations are unreliable and because many recipients of true wrong number calls never notify Snap Finance. Such a list would have the distinction of being both *over* and *under* inclusive in identifying cellular numbers that received *bona fide* "wrong number" calls.

76. Manually entered account notes contain information contemporaneously provided by the customer service agent during the telephone conversation that may illuminate the circumstances behind a number being marked as a "wrong number." A manual review of the account notes can also reveal the identity of the person that answered the call at issue, and the nature of their relationship with the account holder. This relationship, and the conversation that is documented in the account notes, often reveals that the account holder themselves received the call or that a relative answered the call and indicated that the number dialed is not the "best" way to reach the account holder.

77. Each account review tells a unique story of consent. Summarily ignoring this context with the false presumption that these designations always mean that no consent existed to call will result in substantial errors.

**F.** **My Analysis Of A Sample Set Of 500 Calls With A "Wrong Number" Or "Wrong Number - Do Not Call" Designations Revealed 92.6% Can Be Excluded from Class Consideration**

78. In order to test Plaintiff's assumptions and evaluate the efficacy of Ms. Peak's proposed methodology, I conducted a thorough and detailed analysis of a set of sample records produced by Snap Finance to determine if class members could be identified. Put simply, if Plaintiff were correct that the "Wrong Number" and "Wrong Number - Do Not Call" designations reliably identify non-customers, and that reverse lookup information reliably identifies the users of telephone numbers, then one would expect to see the majority of sample "wrong number" telephone numbers corroborated as being used by non-customers. The opposite is true. In my analysis of a random sample of 500 telephone number entries that Snap Finance associated with "Wrong Number" or "Do Not Call," the business records of Snap Finance and the reverse lookup information show the overwhelming majority to be associated with customers.

79. In her *Head v Citibank* testimony, Ms. Peak repeatedly agreed that information contained in individual customer service account records should be reviewed in order to determine if the person who received a call marked with a "wrong number" flag did in fact consent to be called.[50] She specially testified that individual account records should be reviewed in order to exclude non-class members from the list of potential class

---

[50]*Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 69, 89, 101-102, 144, 152, 153, 262-263.

members she would notify.[51] Her Declaration in this case is silent on this point and no automated method to review these individual account records is proposed. For my analysis, I conducted manual examination of all the available data for each telephone number I reviewed, including individual examination of account notes and agent's remarks recorded in the files.

80. An overview of this review process is set forth in the chart below.

[Bottom of Page Intentionally Left Blank]

---

[51] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 153-154, 253-254.

## Visualization of Necessary Review Process



**Step 1a:**
I received 3CLogic "Wrong Number" Data dated 6/2/2017 to 8/31/2019.

**Step 1b:**
I received inContact "Wrong Number" Data dated 9/3/2019 to 8/31/2020.

**Step 2:**
I identified a random sample of 500 numbers from the combined 3CLogic and inContact Data.

**Step 3:**
I submitted those 500 unique phone numbers to PacificEast and LexisNexis for name and date associations.

**Step 4:**
I employed a name matching algorithm to match reverse lookup vendor name associations with Snap customer names at the time of the Snap Finance "Wrong Number" designation.

**Step 5:**
I excluded any telephone numbers that did not successfully receive a text message or outbound telephone call, per the inContact Call Logs, 3CLogic Call Logs, and MessageMedia text message data.

**Step 6:**
For the 56 telephone numbers remaining of the 500 sample, I reviewed Account Notes, inContact Call Logs, 3CLogic Call Logs and MessageMedia Text Message Data for evidence of right party contact despite a "wrong number" designation.

**G.  My Analysis Of A Sample Set Of 500 Telephone Numbers With A "Wrong Number" or "Wrong Number - Do Not Call" Designations Revealed At Least 92.6% of the 500 Would Be Excluded from any Potential Class And The Remaining 7.4% Are Not Reliably Identified**

81. In order to test Plaintiff's assumptions and evaluate the efficacy of Ms. Peak's proposed methodology (as set forth in her Declaration and clarified by her deposition testimony in *Head v. Citibank*), I conducted a thorough and detailed analysis of a statistically sound random set of sample records produced by Snap Finance to determine if class members could be identified. The specific methodology and findings of my analysis are detailed below. Of a random sample of 500 telephone number entries that Snap Finance associated with "Wrong Number" or "Wrong Number - Do Not Call" designations, it is my opinion to reasonable degree of scientific certainty, that at least 92.4% of those should be excluded from a potential class. The remaining potential class members are identified by using highly unreliable vendor data and should not be automatically considered class members as additional investigation is necessary to confirm they received *bona fide* wrong number calls.

### *i.   Selection and Filtering of the Sample Data*

82. I received the following datasets used in my analysis:

| File(s) Received | Description | Date Range Identified in Data |
|---|---|---|
| 3CDeletedPFinal_DMEAST_43164030 (1).XLSX | 3CLogic "Wrong Number" Data | 6/2/2017 to 8/31/2019 |
| SNAP_00000020.XLSX | inContact "Wrong Number" Data | 9/3/2019 to 8/31/2020 |
| SNAP_00000021-51; 31 Bates Stamped csv Files | MessageMedia Text Message Data | 11/10/2019 to 12/7/2020 |
| call log.xlsx | 3CLogic and inContact Call Log Data | 3CLogic (8/14/2018 to 9/24/2019) inContact (9/9/2019 to 1/1/2021) |
| Copy of Notes.xlsx | Account Note Data | 8/16/2014 to 12/30/2020 |

83. I then identified all valid-US telephone numbers in the 3CLogic and inContact "Wrong Number" Datasets.[52] Of those telephone numbers designated as "Wrong Number" or "Wrong Number -Do Not Call,"[53] I used a program called RatStats to select a random sample of the 500 telephone numbers, resulting in a list of 500 unique telephone numbers reported as "wrong numbers" in the 3CLogic and inContact data.

### ii.   Reverse Lookups

84. After sample selection, I submitted these 500 telephone numbers to LexisNexis' Batch Search Solutions and PacificEast's Historic Reverse Phone Append Restricted Tools, which identify names associated with telephone numbers and the date of those associations (if any).

85. Once PacificEast returned the names and dates associated with these telephone numbers, I compared them to the customer names and dates reported in the 3CLogic and inContact "Wrong Number" Data. As per Ms. Peak's recommendation, I only considered PacificEast results that coincided with the date a "wrong number" designation was noted in the 3CLogic or inContact "Wrong Number" data. Subsequently, I identified 284 telephone numbers (56.8%) in which PacificEast identified a name matching that of the Snap Finance Customer ("name matches").[54] An additional 114 (22.8%) of those 500 telephone numbers did not have any name association identified by PacificEast ("no appends"). One hundred and two of the 500 (20.4%) had a name returned by PacificEast

---

[52] I excluded any non-US, governmental or toll-free numbers from this analysis. These designations were made in accordance with the area codes listed by the North American Numbering Plan Administrator: https://nationalnanpa.com/reports/reports_npa.html.
[53] The 3CLogic and inContact "Wrong Number" Data contains only two [Reason]/[Deleted Reason] designations: "WRONG_NUMBER" and "DO_NOT_CALL."
[54] This includes first (3.6%), last (7%), and full (46.2%) names matching the Snap Finance customer name.

that did not match the consumer name ("no matches"). PacificEast associated either Snap Finance's customer or no one at all for 79.6% of the sample numbers.



86. Upon receiving the LexisNexis results and repeating this process (as per Ms. Peak's proposal), I noted the 102 "no matches" from within the PacificEast data were associated with 17 "name matches" in the LexisNexis data. In addition, LexisNexis and PacificEast only report the same, single full name match at the time of the wrong number designation 6.7% of the time (33 instances). It is clear LexisNexis and PacificEast return unique and conflicting results. Which if any of these results is accurate cannot be determined absent an individualized investigation.

87. Within the LexisNexis results alone, I identified 189 telephone numbers (37.8%) with name matches, 244 (48.8%) no appends and 67 (13.4%) no matches. LexisNexis associated either Snap Finance's customer or no one at all for 86.6% of the sample numbers.



88. If, as Ms. Peak proposes, I were to first consider the PacificEast results, and then look to LexisNexis only for information regarding any "no appends" identified by Pacific East, I would identify 316 (63.2%) "name matches," 75 (15%) "no appends" and *only 109 (21.8%)* "no matches" that could result in possible class members from a group of numbers initially designated as "wrong numbers."



89. However, working under the assumption that both PacificEast and LexisNexis return equally reliable results (as Ms. Peak methodology appears to imply), if I were to

consider all names returned by LexisNexis OR Pacific East, I would identify 333 (66.6%) "name matches," 75 (15%) "no appends" and *only 92 (18.4%) "no matches."*



90. The changes in the representative pie graphs above not only outline the differences between the LexisNexis and PacificEast results, but also illustrate how class membership would change dramatically based on which data vendor used. Ms. Peak has no opinion on which data vendor has the most reliable method and in *Head v. Citibank* she testified she would rely on unnamed persons at her firm to make that decision as she has no training or experience in working with this data.[55]

### iii.    A Note on No-Appends

91. In light of the fact that Plaintiff's own methodology results in a heavy majority of the sample numbers being associated with Snap Finance's customers, it is not reasonable to assume that the mere presence of a "Wrong Number" and "Wrong Number - Do Not Call" designation means that a "wrong number" call in fact occurred. Without any name

---

[55] *Head v. Citibank,* Deposition of Carla Peak, Attached as Exhibit 1, p.p. 167-169
Q: Okay. Do you personally make the decisions as to which vendor to go to first or second?
A: I do not.

association from a third-party data vendor to challenge Snap Finance's own documentation, the only available records for these no-appends are Snap Finance's account records showing the numbers are "assigned" to their customers.

92. This finding is not surprising given that the cellular numbers at issue are provided directly by Snap's customer's and the leases at issue are short term. Often there is very little time between the receipt of the cellular number and the calls by Snap, resulting in a timeframe that is too tight to allow for a cellular number reassignment. This is contrast to other "wrong number" cases, such as student loan collection calls, where years may elapse between the time a contact number is provided and when a first collection call is initiated. Here Plaintiff's number was deliberately provided to Snap by its customer in error, a factual scenario that I presume to be rare.

93. There is no reason to submit the telephone numbers to additional data vendors unless there is some evidence that the subsequent data vendor's data is more accurate and reliable than the first vendor. Ms. Peak makes no such claim.

### iv.   Account Level Review

94. After concluding the analytical steps outlined above, there remained a subset of 92 records that had not already been excluded from possible class membership. This represents just 18.4% of the 500-number sample.

95. I reviewed MessageMedia's Text Message Data, inContact and 3CLogic's Call Log Data and Snap Finance's Account Note records to (a) determine if any telephone calls or text messages had actually been sent to these 92 telephone numbers, (b) identify instances where some other type of right party contact at that telephone number was made within 45 days prior to or after the "Wrong Number" or "Wrong Number - Do

Not Call" designation was found in the data[56] or (c) determine if any additional exclusions from a potential class should be made with this supporting data.[57] Of the subset of 92 remaining telephone numbers I excluded 55 for one of the aforementioned reasons, leaving only 37 (7.4%)  cellular numbers from the 500 number sample for further investigation as belonging to potential class members .

96. Examples illustrating this analysis are described in detail below.

> *Some Telephone Numbers With "Wrong Number" or "Wrong Number - Do Not Call" Designations May **Not** Have Received A Call or Text*

97. After identifying the 92 telephone numbers identified in the 3CLogic and inContact "Wrong number" data, I reviewed the MessageMedia Text Message Data, inContact Call Log Data and 3CLogic Call Log Data to identify when, if ever, these telephone numbers were contacted by Snap Finance. I found that 36 of these 92 telephone numbers (39.1%) are not documented as receiving any outbound telephone call or a text message

---

[56] Ninety days is generally considered the amount of time it typically takes an abandoned cellular number to be reassigned to another consumer. See https://www.dnc.com/news/reassigned-phone-numbers-one-call-rule-solution. I conservatively applied a 45-day period based on FCC guidelines that cellular numbers should not be reassigned until 45 days after the number is abandoned. *See* In the "Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls" put before the Federal Communications Commission (CG Docket No. 17-59, Second Report and Order FCC 18-177).  Here the FCC states "Aging numbers are disconnected numbers that are not available for assignment to another end user or customer for a specified period of time. Numbers previously assigned to residential customers may be aged for no less than 45 days and no more than 90 days. Numbers previously assigned to business customers may be aged for no less than 45 days and no more than 365 days." In a July 2, 2020 Public Notice, the FCC again maintains this 45-day period is proper: "Therefore, beginning July 27, 2020, voice service providers must maintain records of the most recent date each number was permanently disconnected and must age telephone numbers for at least 45 days after disconnection and before reassignment."

[57] I also looked at the LexisNexis data to identify any current name associations belonging to customers but did not identify any. Attached as Exhibit 7.

from Snap Finance in the data I reviewed.[58] This is evidence that a "Wrong Number" or "Wrong Number ‑ Do Not Call" designation does not mean a call or text occurred.

*Manual And Time-Intensive Analysis Of The Account Records Is Necessary*

98. Conducting this analysis was time consuming and required the simultaneous observation of multiple datasets. Account Notes Data need to be reviewed considering both the Call Log Data, Text Message Data and the "Wrong Number" Datasets. My review proves that using "wrong number" naming conventions oversimplifies class identification and results in highly inaccurate class identifications. The nuance found in the individual Snap Finance account records reveals supposed "wrong number" calls made to authorized recipients and that purported "wrong numbers" are used by customers *after* they are designated as such to communicate about the account. Or the individual circumstances regarding when and how a "Wrong Number" or "Wrong Number ‑ Do Not Call" designation was documented may create the superficial appearance that a "wrong number" call was made, when in fact the fullness of the account records shows that no "wrong number" call occurred. The thorny complexity of validating "wrong number" calls requires a painstaking and detail-intensive manual review of account notes along with additional research.

99. For example, telephone number (469) ▇▇-9793 (the "9793 number") was identified as a "Wrong Number" in the inContact "Wrong Number" Data on July 24, 2020. However, the inContact Call Log and Account Note Data reflect that an inbound call was placed to Snap Finance from the 9793 number on July 30, 2020 by the customer to set up a

---

[58] This number is calculated using the inContact Call Log, 3CLogic Call Log and MessageMedia Text Message Data currently available to me. If additional data is produced, I reserve the right to update these findings accordingly.

payment for August 13, 2020. This inbound call and subsequent activity indicated the original "Wrong Number" designation was incorrect.

100.     On November 8, 2019, and inbound call to Snap Finance was placed by Angel Rios Chico from his telephone number (813) ■■■-9309 (the "9309 Number"). "Angel ci [called in] to check the balance… cx phone from #(813) ■■■-3223 to #(813) ■■■-9309." Here the Snap Finance customer updates his phone to the 9309 Number, yet the phone is identified as a wrong number on December 11, 2019, just over a month later. As this happens within a 45-day period, it is unlikely that the Angel Rios Chico abandoned his cellular number, and it was subsequently reassigned during this timeframe.

101.     An Account Note dated March 11, 2020 indicates that Snap Finance customer Joshua Deloach indicated via an inbound call from (281) ■■■-9821 (the "9821 Number") that he was no longer wanted his leased living room set:

> "merchandise is not working well and he does not want it… living room set does not work very well--- twin bedroom set ---it is too small and not at all to what he agreed cx does not want to have merchandise he does not want it anymore he has tried to call store two days in a row they do no pick up the phone… they do not accept cancelations or returning though they can help with merchandise not working well I adv to call cx cx hung up called back explained policies and hung up"

102.     On April 4, 2020, MessageMedia sent a text to the 9821 Number because Mr. Deloach missed a payment on the furniture. Seven days after that text, and less than one month after talking with Mr. Deloach on the 9821 Number, a "Wrong Number" designation was applied to the 9821 Number. Because the cellular number could not have been reassigned to another customer that quickly it is likely this call was answered by Mr. DeLoach and it was not a *bona fide* wrong number call. Additional investigation would be required before including the 9821 Number in a potential class.

103.     In other instances, a "wrong number" designation may be applied to a call answered by a third party that is related to the customer, putting into question the question of consent.  For example, an Account note related to (336) ███-7060, dated 12/21/2017, reads "CELL PHONE : WRONG NUMBER. tap customers mom said he doenst not reside at this number." Another dated December 5, 2018 for telephone number (806) ███-9994 indicated third party contact with a father: "OBC, left message with third party - his dad."

104.     Overall, the use of multiple resources to corroborate what a telephone user says, and how and why a "wrong number" designation is made, is necessary in determining a potential class, something Ms. Peak acknowledged is necessary but omits in her proposed methodology.

*Manual and Time-Intensive Analysis Of The MessageMedia Text Data Is Necessary*

105.     Upon reviewing the MessageMedia Text Message Data alongside the 3CLogic and inContact "Wrong Number" data, I identified several inbound text messages received by Snap Finance after a "Wrong Number" designation had been made. Often, these inbound text messages reveal customer contact after the "Wrong Number" or "Wrong Number - Do Not Call designation is recorded, providing evidence that these designations were not properly determined in the first place.

106.     For example, the telephone number (303) ███-5117 (the "5117 Number") was identified as a "Wrong Number" on January 27, 2020. An additional lease application was submitted to Snap Finance on August 13, 2020 (Application ID ██████████ )

in Colorado, under the same name Christin Rossi.[59] On October 30, 2020, and inbound text message was received by MessageMedia: "I tried to go in and make a payment but apparently the system just took the past due payment only. Is it going to double charge me now or is there a way to pay the difference for the agreed payment of -ñ175.05?"

107.    This inbound text message indicates that, despite the "Wrong Number" designation made in January of 2020, any subsequent calls or texts to the 5117 Number would have been received by another Snap Finance customer, as evidenced by the additional application and payment conversation on October 30, 2020.[60] Often, the MessageMedia Text Message Data provides context for the other datasets in this case. However, it should be noted that the MessageMedia data should be used for exactly this: context. Often an inbound text messages in the MessageMedia data will contain the string "wrong number" (or a similar variation), yet this does not necessitate MessageMedia transmitted a text message to a wrong number. This determination would require a time-consuming manual review of text data.

108.    A key word search of the inbound text messages using the phrase "wrong number" returns a significant number of communications that do not refer to the receipt of a *bona fide* "wrong number" text. Examples of these messages are set forth in the table below:

---

[59] All applications associated with (303) ███-5117 in the inContact "Wrong Number" Data correspond to the Customer Name "Christin Rossi" (████████████████████████████████).
[60] Of the 101,418 telephone numbers identified in the 3CLogic and inContact "Wrong Number data," 4,032 (4%) are associated with an application submitted after a "wrong number" designation was recorded.

| Consumer Telephone Number | Time Stamp | Text Message Content |
|---|---|---|
| 214█6726 | 12/11/19 20:06 | No your not charging me a return charge I have call you twice now because you ran the wrong card or account we been through this before you have the right card and the money was there your obviously running that wrong number again you done it again last week,  when the money was there you can run it Friday  12-13, again for this coming Friday and last Friday amount but don't add a late charge I can't keep calling you and giving you my information I have done this twice now. |
| 248█1651 | 6/19/20 20:32 | I didn't have insufficient funds someone wrote the wrong number down so I shouldn't be charged for that |
| 252█8425 | 1/7/20 16:47 | Hi, I have been trying too reach you all. But when it's asking for my account number it's saying it's the wrong number. |
| 254█3179 | 6/19/20 15:17 | that will be fine.  It's the same account that somehow you keep getting the wrong numbers |
| 352█7757 | 2/4/20 20:36 | Sorry I see the mistake hit wrong number █ 12/23 837 |
| 385█5441 | 12/9/19 23:36 | The whole balance was only $386 I think you are looking at a wrong number |
| 4056283121 | 11/25/20 22:52 | Wrong number card need 3186 |
| 602█1288 | 1/20/20 17:15 | Yes I have no idea why you have not charge it already. There is no problem with this card you guys were putting in wrong numbers. |
| 617█1311 | 2/7/20 16:26 | My back pays it nomatter I got over draft never had problems u probably mark wrong number |
| 646█7558 | 5/19/20 15:54 | That is not the last four of my visa.  Wrong number.  Can I call after 3pm today am at the doctors and will not be available to talk and get this resolved until then. |
| 719█9787 | 5/28/20 21:08 | Sorry, I gave a wrong number. Card number is █. All other info is correct. |
| 810█9465 | 1/23/20 12:25 | Those are the.wrong numbers i will get my card ony.lunch break. Money will be.on the card fri |
| 904█0803 | 3/17/20 14:19 | That is a wrong number I was at 800 in December |
| 954█1076 | 10/8/20 20:03 | The account number i gave yesterday has a wrong number in it |

109.     There were also several instances in which the "wrong number" text identified an alternate method of contact. For example, an inbound text message from (850)█-1196 dated February 28, 2020 states, "Gave wrong number Right one 561-█-7029." This

indicates that the numbers identified in the 3CLogic and inContact "Wrong Number" data could still be associated with a third party in contact with the Snap Finance customer.

110.     To further this point, I identified all valid-US telephone numbers associated with an inbound MessageMedia text containing the string "wrong number."[61] I then used a program called RatStats to select a random sample of 100 such numbers and submitted these to LexisNexis and PacificEast to identify names associated with these telephone numbers and the dates of those associations. Of the 100 telephone numbers associated with a "wrong number" text, LexisNexis identified 23 (23%) and PacificEast identified 51 (51%) with names matching that of the Snap Finance customer at the time of the purported "wrong number" text. All together 58 telephone numbers associated with a "Wrong Number" text were associated with the Snap Finance consumer (58%), and therefore should not be considered "wrong numbers."

### *"Wrong Number" and "Wrong Number - Do Not Call" Designations Do Not Exclusively Refer to Bona Fide "Wrong Number" Calls*

111.     The 3CLogc and inContact "Wrong Number" Datasets only record an assignment of a cellular number to the designations of "Wrong Number" or "Wrong Number - Do Not Call." The reason for this designation is not always readily available in these Datasets and can be of great importance when determining if a "Wrong Number" designation was correctly entered. Consider the following: the 3CLogic "Wrong Number" Data identifies telephone number (404)███-0613 (the "0613 Number") as a

---

[61] BRG considered the following text strings: 'wrong number','wrong phone number','wrong' and 'phone number','wrong #','wrong#','wrong no' but not 'wrong now' and 'wrong num.'

"Wrong Number" on November 16, 2018. However, the 3CLogic Call Log Data and Account Notes for that date identify an outbound call placed to the 0613 Number indicating the "CELL PHONE : NOT IN SERVICE." This telephone number was not a "Wrong number," it was simply not in service.

### *"Wrong Number" and "Wrong Number - Do Not Call" Designations May Not Correctly Identify Account Holder Name or Identify All Authorized Users*

112.   There may often be multiple authorized users or account holders associated with a single Snap Finance account. Similarly, a single account holder may hold multiple accounts. The 3CLogic and inContact "Wrong Number" Datasets do not necessarily capture this level of detail.

113.   For example, the telephone number (443) ███-0567 ("0567 Number") was designated as a "Wrong Number" in the 3CLogic "Wrong Number" Data on November 9, 2018. Shawntel Morris is identified as the Snap Finance customer name. However, on December 14, 2018, an inbound call from the 0567 Number was identified in the 3CLogic Call Log Data and Account Notes indicate that the account holder "Miss. Shakeidra gave verbal permission to add: Kendra Jackson as auth on the account… Miss Kendra agreed to replenish those payments because she was not aware that we are taking the payments from the account of miss Shakeidra. Miss Kendra gave me her card for we to take the payments from this card."

114.   This inbound call serves as confirmation that (a) this is, in fact, not a wrong number, (b) authorized account holders may not be identified in the 3CLogic/inContact "Wrong Number" Data at all and (c) there may be multiple authorized users on a single account – something the 3CLogic and inContact "Wrong Number" data does not always display.

A robust, individualized and in-depth review of Call Log and Account Note Data is necessary to correctly identify proposed class members.

115.    To this end, I identified two authorized Snap Finance users not identified in the 3CLogic or inContact "Wrong Number" data, but instead identified in both the Account Note Data and the LexisNexis results at the time of the "wrong number" designation.

116.    According to an account note dated May 7, 2019, Snap Finance Account Holder Nubia Cantu authorized Osvaldo Garza on her account and provided his email address (████████@yahoo.com). While Nubia Cantu is not identified in the LexisNexis or PacificEast results for telephone number (210) ███-5203 (the "5203 Number") at the time of the "wrong number" assignment, Osvaldo Garza is. Mr. Garza is identified in the LexisNexis results with first and last seen dates of June 15, 2016 and February 1, 2020, covering January 9, 2020 when the "wrong number" designation was applied. Therefore, the 5203 Number should be excluded from class membership based on the identification of an authorized user.

117.    Linet Lewis is identified as the Snap Finance Customer associated with (702) ███-1453 (the "1453 Number"), labelled as a "wrong number" on December 7, 2018. Again, Linet Lewis was not identified by either LexisNexis or Pacific East at the time of the "wrong number" designation. However, the email address ████████@yahoo.com is identified in account notes dated November 2, 2017 and an Ingrid Thorbourne (a first name match) is associated with the 1453 Number in LexisNexis from November 1, 2017 to November 1, 2019. PacificEast also identified two first name matches associated with the 1453 Number: Ingrid Watson (dated 2/17/18-11/1/20 and 3/21/17-11/1/20) and Ingrid Thorbourne (dated 1/3/18-6/1/2020 and 2/22/12-11/1/20). In all three cases, the

LexisNexis and PacificEast data indicate the 1453 was not a wrong number- not through account holder name, but through an authorized user's email address.

*Relying Only On Name Associations May Result In Overlooking Caller ID Name Matches*

118.     Neither LexisNexis nor PacificEast returned any name associations[62] that matched the customer name Jacob Robinson for telephone number (313) ██-7184 (the "7184" number), which was marked a "wrong number" on January 3, 2020. However, LexisNexis does associate the 7184 Number with the CallerID "Jacob Robinson." This indicates that Jacob Robinson is currently associated with the 7184 Number and calls into question the "wrong number" designation noted in 2020.

*A "Wrong Number" or "Wrong Number - Do Not Call" Designations May Indicate Contact With Another Snap Finance Customer*

119.     According to the 3CLogic "Wrong Number" Data, telephone number (318) ██-4144 (the "4144 Number") was identified as a "Wrong Number" on June 28, 2019. The inContact "Wrong Number" Data identifies an additional "Wrong Number" designation on July 10, 2020. While the "Wrong Number" Datasets identify multiple Snap Finance lease applications and customers associated with this telephone number, the MessageMedia data further illuminates the complex nature of communication between Snap Finance and its customers. See the chronological sequence of events below:

[Bottom of Page Intentionally Left Blank]

---

[62] Neither LexisNexis or PacificEast returned any name associations on the date the 5489 Number was identified as a wrong number in the inContact "Wrong Number" database: January 3, 2020. LexisNexis does identify Jacob J Robinson as associated with this telephone number from December 1, 2019 to January 1, 2020.

| 4/27/2019 | Darlene Green submitted an application on April 27, 2019 (████████) associated with the 4144 Number. |
|---|---|
| 6/28/2019 | The 3CLogic "Wrong Number" Data identifies a "Wrong Number" designation for the 4144 Number on June 28, 2019. |
| 10/23/2019 | Priscilla Walton submitted an application on October 23, 2019 (████████) associated with the 4144 Number. |
| 2/6/2020 | Priscilla Walton submitted a second application on February 6, 2020 (████████) associated with the 4144 Number. |
| 2/20/2020 | An inbound text message from the 4144 Number was identified in the MessageMedia dated February 20, 2020 at 6:30:24 PM GMT. This sender of this text message self-identifies as a "good paying customer." |
| 7/10/2020 | The inContact "Wrong Number" Data identifies a "Wrong Number" designation for the 4144 Number on July 10, 2020. |
| 8/26/2020 | Darlene Green then submitted a second application on August 26, 2020 (████████), associated with the 4144 number. |

120.     In this example, a "Wrong Number" designation associated with Darlene Green does not necessitate that subsequent calls to the 4144 Number were inappropriately placed regarding Priscilla Walton's accounts and vice-versa. These two individuals appear to share a telephone number and, as evidenced by their repeated lease applications containing the 4144 Number, it is not a "wrong number."

### *In Summary*

121.     Of the 92 telephone numbers, I was able to exclude an additional 55 for one of the reasons outlined above. Therefore, of 500 telephone numbers identified in my sample of "wrong numbers," 92.6% can be excluded from class consideration. Class inclusion of the remaining 7.4% requires additional research due to the inaccuracy of unreliability of the reverse lookup data.

| | | |
|---|---|---|
| | 333 | Name Matches in LexisNexis or Pacific East at Time of Wrong Number Designation (66.7%) |
| | 75 | No Appends, No Results in LexisNexis or Pacific East at Time of Wrong Number Designation (15%) |
| | 36 | Telephone Numbers NOT Associated with Successful Outbound Texts or Telephone Calls (7.2%) |
| | 3 | Telephone Numbers with Authorized Users or Emails Identified in Account Note Data Name Matching LexisNexis or Pacific East Results at Time of Wrong Number Designation (0.6%) |
| | 7 | Telephone Numbers Associated with Right Party Contact After Wrong Number Designation or Incorrect "Wrong Number" Designation Evidenced by Account Notes (1.4%) |
| | 7 | Telephone Numbers Associated with Right Party Contact Within 45 Days Before "Wrong Number" Designation (1.4%) |
| | 2 | Telephone Numbers in Which LexisNexis or Pacific East Name Match was Identified BOTH Before and After "Wrong Number" Designation, But not ON Date of Wrong Number Designation (0.4%) |
| | 37 | Telephone numbers Requiring Additional Research to Define Class Membership (7.4%) |

## H.  Reverse Cellular Lookup Data Is Highly Inaccurate

122.     The poor performance of Ms. Peak's methodology in my analysis above should come as no surprise. The information provided by reverse lookup services is inherently affected by significant errors and omissions in the source records. In my capacity as an investigator with decades of professional experience using public records data vendors, I am keenly aware of the limitations inherent in these data sources. None of the third-party vendors selling "reverse cellular lookup" name associations provide reliable and accurate data. Relying on this inaccurate data can only produce an error ridden list of purported "class members."

*i.    The Sources of Data Used by Reverse Lookup Services*

123.    Reverse cellular lookup data is markedly less reliable than other types of authoritative information, such as real estate ownership and business records sold by vendors such as LexisNexis. The difference is that these types of records are sourced verifiable public records such as recorded deeds and other government records. By contrast, cellular telephone usage is not publicly available information, so the data is drawn from undisclosed sources of unknown reliability.

124.    As a consequence of these well-known issues, professional investigators like me, who use this data to identify the actual user of a telephone number at a particular time, only consider such reported associations to be a lead, one of many possible inputs for subsequent investigative work. Additional investigation that can evaluate the accuracy of the lead could include a review of the reported data for obvious errors, a search of public records, media sources and the internet, or even direct contact with the subject.

*ii.    Different Data Vendors Return Different Results For The Same Telephone Number*

125.    The unreliability of the reverse lookup information sold by Ms. Peak's preferred data vendors is obvious from the fact that they report different names and date associations for the same cellular numbers. This is amply demonstrated by the result of the testing I conducted on the 6823 Number. As of August 2020, Ms. Peak had never compared the results reported by these vendors and was unaware they produced markedly inconsistent results. She admitted this lack of consistency gave her concern about the accuracy of this data.[63]

---

[63] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 168.

126.     Her proposed use of multiple vendors to backfill when the first vendor fails to provide information is itself an admission that the vendors report inconsistent information. Ms. Peak proposes to move from one vendor to the next, seemingly without end, and with no verification that any of the names she obtains in fact used the telephone number during the relevant timeframe. If the data sold by the vendors was complete and accurate Ms. Peak would need only one vendor and each vendor, if reliable, would report the same names and date associations.

127.     These discrepancies occur because the data vendors rely on their own unique and undisclosed proprietary sources as support for the names they link to cellular telephone numbers. Absent any evidence that one vendor provides more reliable data than another, the selection of one vendor as a primary source is entirely arbitrary.

128.     I have tested the outcomes in selecting one reverse lookup vendor over another as a part of my expert analysis in a number of TCPA cases, including *Pieterson v. Wells Fargo Bank, N.A.*, No. 3:17-cv-02306-EDL (N.D. Cal., Report filed October 2018); *Fitzgerald v. Universal Pictures*, No. 6:16-cv-01193-CEM-DCI (M.D. Fla, Report filed July 2, 2018) and *Flowers v. Twilio, Inc.*, No. RG16804363 (Sup. Ct. Cal., Report filed 2017). My statistical findings and my observations regarding these inconsistencies have never been challenged.

129.     In each of those cases I compared the results of sample telephone numbers returned by two or more reverse lookup vendors to determine how often they associated the same one name on the date of a prior communication. My testing found these services agreed on the same results only 7% to 14% of the time. The remaining numbers either returned

multiple names for the same time period, different names for the same time period or no names at all.

### iii.    *Reverse Lookup Data Vendors Do Not Purport To Offer Accurate Results*

130.    The reverse cellular look up vendors do not publish accuracy statistics and when questioned regarding the accuracy of the data they sell are frank about its limitations. In an email responding to BRG's questions regarding the accuracy of its cellular telephone reverse lookup data, Bette Lou Kliewer, Pacific East's Senior National Accounts Manager indicated that the accuracy of the data it sold was a crap shoot:

> "Measuring accuracy is a bit of a throw of the dice just depending on what aspects of accuracy you find are important. We're never going to give you a name and address that has never been associated to the phone you send us, but the dates we have on file for that name/address/phone combination may not be perfect so that measure of date accuracy may not be what you are looking for."[64]

In addition, PacificEast makes clear in its licensing terms and conditions that it does not warrant the accuracy of the data that it sells.[65] LexisNexis provides a disclaimer similar to that of PacificEast with respect to the accuracy of its telephone lookup services:

> Important: The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. ***This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified***.[66] (Emphasis added)

### iv.    *I Have Tested And Confirmed That Reverse Cellular Directory Data Vendors, Including PacificEast And LexisNexis, Provide Inaccurate Results*

---

[64] October 2, 2019 email from Bette Lou Kliewer, attached as Exhibit 8.

[65] See Terms and Conditions attached as Exhibit 9.

     10.2. PacificEast hereby disclaims all warranties or guarantees pertaining to the licensed data and/or services, including, without limitation, the warranties of fitness for a particular purpose, non- infringement, accuracy, quiet enjoyment, title, merchantability and those that arise from any course of dealing or course of performance are hereby disclaimed. PacificEast does not warrant that the licensed data and/or services will be uninterrupted or error-free, or that errors will be corrected.

[66] LexisNexis Disclaimer, attached as Exhibit 10.

131.    As a private detective and through my work conducting internal investigations for the last twenty years, I have had the opportunity to test the accuracy of the cellular lookup data provided by a wide assortment of data vendors on thousands of occasions. In addition to that extensive first-hand experience, as a data analytics expert in TCPA cases I have conducted independent accuracy testing as well as comparative analysis of the data reported by commonly used data vendors that sell historic cellular lookup data, including PacificEast, LexisNexis and TransUnion's TLO service. My testing has informed my opinion that the data reported by these services is incomplete, inaccurate and highly unreliable.

132.    In order to rigorously test the reliability of a reverse lookup service, it is necessary to have a sample population of telephone numbers for which the tester already knows the correct user's names. To this end, in April 2016 I prepared a sample set of 166 cellular telephone numbers for which I knew the then-current users' names. In February 2019 I prepared a second sample set 184 cellular telephone numbers published on online business websites as the then-current contact information for real estate agents, forensic expert witnesses, and freelance publishing professionals. At various times I have submitted these sample sets to different data vendors to compare their reverse append results to the known users.

133.    Although many of these users from 2016 and 2019 may still be the users of these telephone numbers, for the purposes of my testing I am only concerned with whether the reverse lookup can accurately identify the known user at the same moment in time when I initially determined the user—that is, April 2016 for the first set of 166, and February 2019 for the second set. This historical lookup is therefore comparable to the

process used in TCPA "wrong number" cases, in which the user of a telephone needs to be identified for a specific moment in the past when a potential "wrong number" call was made. In March 2020, I submitted the first sample set to PacificEast's batch reverse append service. As detailed below, PacificEast only correctly identified the known user of the telephone numbers 36% of the time. The other results were either a failure to return any name, a failure to return any name at the correct time frame, returning a known wrong name for the time frame, or returning a partial name match that would require additional investigation to resolve.



134.     LexisNexis performed no better in my previous tests of its accuracy. In fact, when I first conducted this test in 2016, when the goal of the test was to identify what would then have been the *current* users of the numbers LexisNexis' reverse lookup returned the correct user name for only 67 cellular numbers, representing an accuracy rate of just 40%.[67] Furthermore, the dates associated with the correct name associations were highly inaccurate.

135.     In February 2019, I repeated this analysis using a LexisNexis reverse telephone batch process, for what would now be a *historical* match for April 2016. LexisNexis correctly identified just 48.8% of the known users.[68] Also in February 2019, I researched the second sample of 184 numbers, for what would have then been a search for the current users of those numbers. LexisNexis correctly associated only 106 (57.6%) of the known users as of the date the cellular number was located online.[69]

136.     Importantly, these tests represent a "best case" scenario involving professionals who actively publish and publicize their cellular numbers as business contacts, and who are therefore incented to retain their numbers over time and make them publicly available. These tests underrepresent people who rely on prepaid telephones (which is common among persons, such as that are economically distressed), change telephone numbers regularly, or do not actively publicize their telephone numbers. In my opinion, a reverse lookup service that peaks at an accuracy rate of between 40-57% under the

---

[67] I do not know if any pre-paid plans were included in the data set, but I did not take any steps to exclude them and assume that pre-paid plans were included in some percentage. The test results are set forth as Exhibit 11.
[68] *Id.*
[69] *Id.*

most favorable conditions is an unreliable source and is at best a "lead" which can be confirmed only after additional investigative steps.[70]

**I.   Plaintiff Offers No Reliable Method To Identify And Remove Customer Names From Any Proposed List Of Potential Class Members**

137.    Ms. Peak's Declaration is silent as to how she will use the "ultimate notice list," other than to state that she will "de-duplicate the numbers."[71] Presumably, Ms. Peak will compare the names on the Snap Finance list to the names returned by her data vendors and exclude any Snap Finance customers, but she provides no explanation how she will do so. In my experience, the only way to perform this filtering in an automated way is to employ complex name matching software.

138.    Typically, such an undertaking involves the selection of name matching software for the particular level of accuracy required for the task at hand.

139.    In her *Head v. Citibank* deposition, Ms. Peak admitted she has no experience in conducting name matching analysis and could articulate no methodology she would employ to filter out the Snap Finance customer names.[72] For example, she would not commit to such basic steps as taking into consideration the fact that people who marry or divorce change their last names.[73] Ms. Peak acknowledged  that the selection of one

---

[70] Although Ms. Peak has not suggested the use of TransUnion's TLO service, I should note for the sake of comprehensiveness that I have also tested this service as well, with similarly dismal results. In May 2019, I tested the second sample of 184 telephone numbers using TransUnion's TLO data. TLO correctly identified only 106 (57.6%) of the users as of the date that I found the number being advertised online.
[71] Declaration of Carla Peak ¶ 14.
[72] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 59, 250.
[73] *Id*, p, 251.

name matching program and one set of tolerances over another would substantially alter the composition and accuracy of her proposed class list.[74]

140.    Name matching is a complex process due to the multiplicity of name variations found in the vendors' data. For example, searching for my name could return a dizzying set of variations that would include some combination of my legal first name "Margaret," my middle name "Ann," my nickname "Peggy," my initials, my legal last name "Daley," or my husband's last name "Libbe."[75] This name matching process is necessary, as people change their names with some regularity due to marriage and divorce, and nicknames are common in almost every nationality and culture. Individual choices of how to deploy a name matching process also influence the results, potentially leading to a higher incidence of false positives or false negatives. How the name matching process will be conducted directly affects the quality and reliability of the results.

141.    Each name matching software product has its own "tolerance" for assigning a match, some requiring a 100% "string match," meaning every letter must be the same. With that requirement a customer named "Jon Smith" and a third-party vendor associated name of "John Smith" would not be considered a match and "John Smith" would be considered a class member.

142.    Other name matching software programs assign letter and number keys for similar sounds, meaning that phonetic algorithms are used to turn similar sounding names into

---

[74] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 250.
[75] These complexities are not recognized by Ms. Peak, who testified, for example, that she was unaware "Peggy" was a nickname for "Margaret" and unaware that last name changes are common and need to be considered. *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, pp. 248, 249.

the same key. Thus, in the name matching platform Soundex, the names Cyndi, Canada, Candy, Canty, Chant and Condie share the code C530 and as such the names "Cyndi" and "Candy" would be considered a match.[76]

143.    Ms. Peak agrees that the type of name matching methodology used and the assigned tolerance levels for name matches will materially affect the size and composition of the class and the reliability of the class member identification.[77] I am unable to analyze and opine as to the reliability of this part of the methodology as Ms. Peak does not disclose how it will be conducted.

## J.  CONCLUSION

144.    It my conclusion to a reasonable degree of scientific certitude, based on my analysis set forth above, that *bona fide* recipients of wrong number calls and texts from Snap cannot be identified using the methodology proposed by Plaintiff's expert Carla Peak. It is my further opinion that these class members could only be identified by undertaking a complex, time consuming manual review of the relevant dialer data, text logs and account records and that such an investigation would still be unable to identify a substantial number of such persons.

[76] https://www.rosette.com/blog/overview-fuzzy-name-matching-techniques/
[77] *Head v. Citibank*, Deposition of Carla Peak, Attached as Exhibit 1, p. 250.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 8, 2021

_____

Margaret Daley