Aaron D. Radbil (*pro hac vice*)
Alexander D. Kruzyk (*pro hac vice*)
GREENWALD DAVIDSON RADBIL PLLC
401 Congress Avenue, Suite 1540
Austin, Texas 78701
Phone: (512) 803-1578
aradbil@gdrlawfirm.com
akruzyk@gdrlawfirm.com

Michael L. Greenwald (*pro hac vice*)
GREENWALD DAVIDSON RADBIL PLLC
7601 North Federal Highway, Suite A-230
Boca Raton, Florida 33487
Phone: (561) 826-5477
mgreenwald@gdrlawfirm.com

Jason E. Greene (Bar No. 13990)
Jared D. Scott (Bar No. 15066)
ANDERSON & KARRENBERG, P.C.
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Phone: (801) 534-1700
jgreene@aklawfirm.com
jscott@aklawfirm.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| BRANDI WESLEY, *on behalf of herself and others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>SNAP FINANCE, LLC,<br><br>        Defendant. | **PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**<br><br>Civil Action No. 2:20-cv-00148-RJS-JCB<br><br>District Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |
| SNAP FINANCE, LLC,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>DERRICK DEON JACKSON, JR., a/k/a DERRICK JOHNSON,<br><br>        Third-Party Defendant. | |

I.   **Ms. Wesley establishes numerosity.**

During the proposed class period Snap used the inContact dialer to deliver prerecorded voice messages to 32,780 cellular telephone numbers it marked with a "wrong number" notation. *See* ECF No. 64 at 11, 13. This, alone, is sufficient to establish numerosity. *See* ECF No. 64 at 12-14 (discussing numerosity and collecting cases).[1]

And that Snap's proposed expert[2] purports to have determined that 92.6% of a random sample of 500 wrong number-designated cellular telephone numbers "can be excluded from class consideration," ECF No 71-7 at 53, ¶ 121, does not weigh against, but rather in favor of, a finding of numerosity. Because even if Snap's proposed expert's suggestion was not flawed—it is[3]—it

---

[1]   *Accord Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 241 (D. Ariz. 2019) (finding numerosity satisfied in a wrong-number TCPA class action based on evidence very similar to the evidence Ms. Wesley presents); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807, *13 (S.D. Fla. June 26, 2018) (same); *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501, 502 (S.D. Ind. 2016) (same).

[2]   A number of courts have certified TCPA class actions in the face of reports from Snap's proposed expert, Margaret Daley. *See, e.g.*, *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 158 n.8 (S.D. Cal. 2019) (certifying a TCPA class and stating: "The Court does not credit what appears to be [Ms. Daley's] fundamentally freestanding legal conclusion calculated to defeat the predominance requirement of Rule 23(b)(3)."); *Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659, at *12 (N.D. Ill. Mar. 21, 2019) (certifying a TCPA class, characterizing as "concerning" the disparity between the plaintiff's expert's finding and Ms. Daley's finding, collecting cases contradicting Ms. Daley's finding, and accepting the plaintiff's expert's finding); *Johnson*, 315 F.R.D. at 503 (certifying a TCPA class, and rejecting Ms. Daley's conclusion that the plaintiff's proposed method for identifying class members was not adequate).

[3]   Snap's proposed expert disclaimed her conclusion when questioned about it. *See* Daley Transcript, attached as Exhibit A, at 50:2-6 ("Q. So what you're saying is nobody that's associated with those 92.6 percent of telephone numbers could meet any of the three proposed class definitions? A. That's not what I'm saying."). She then testified that "[w]hether or not a particular person is in fact a class member is not within the scope of my retention." *Id*. at 57:14-16. Moreover, Ms. Daley stated that what she actually did was exclude people from class membership based solely on a review of Snap's records and the results of reverse look-ups that she ironically characterized as "highly unreliable." *Id*. at 60:10. As well, she conceded she made no effort to allow class members to self-identify. *Id*. at 64-65 (noting she did not call the telephone numbers

1

means, when extrapolated, that Snap's proposed expert is unable to exclude from class consideration 2,425 of the 32,780 wrong number-designated cellular telephone numbers to which Snap delivered a prerecorded voice message by using the inContact dialer.[4] And this, by itself, is sufficient to satisfy numerosity. *See Knapper*, 329 F.R.D. at 241 ("Even assuming what the Court construes as Defendant's lowest estimate of the putative class—30% of 11,920 phone numbers . . . the putative class size here satisfies the numerosity requirement.").[5]

As well, Snap's argument that numerosity is lacking because Ms. Wesley did not "identify a single person similarly situated to [her]," and "has only ever identified herself as a member of the class," ECF No. 71 at 19-20, is groundless, as Ms. Wesley "need not establish any precise number of class members at this stage, or have already identified who is part of the class." *Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *3 (D.N.M.

---

at issue, did not issue publication notice, did not create a dedicated website, and did not target online advertising toward the telephone numbers). Of course, self-identification is critical in a wrong-number TCPA class actions, like this matter, where the defendant necessarily does not have the names of the non-accountholders it called. *Id*. at 116:23-117:1 ("Q. Right. In that scenario, class members would have to self-identify, in other words? A. Sure."). And here, Ms. Daley admitted that Plaintiff did just that. *Id*. at 23:14-17 ("Q. Right, and did Ms. Wesley self-attest to being a member of all three proposed classes? A. I believe she has. She said she used the phone exclusively and received the calls and texts.").

[4]    Self-servingly, Ms. Daley contends Snap's internal records notating wrong numbers are inaccurate, while at the same time assuming Snap's other internal records, including customer names and outgoing calls, are completely accurate. *See* Daley Transcript at 125:19-126:17.

[5]    This does not account for the estimated 50,000 additional wrong number-designated cellular telephone numbers to which Snap delivered prerecorded voice messages by using the 3CLogic dialer. And a numerosity analysis here should account for them, because the only reason Ms. Wesley must estimate the number of wrong-number designated cellular telephone numbers to which Snap delivered prerecorded voice messages by using the 3CLogic dialer is that Snap kept inadequate records. *See* ECF 64-8 at 16 (99:3-6); 17 (105:5-19); 18 (107:5-9); 19 (115:3-6). But "inadequate record keeping is not grounds to defeat the class certification or it would be fairly easy for [defendants] to defeat such motions." *Drossin v. Nat'l Action Fin. Servs., Inc.*, 255 F.R.D. 608, 614 (S.D. Fla. 2009); *see also Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000) ("Should a . . . company . . . be able to avoid class action liability by mere fact of inadequate record-keeping, the Congressional purpose behind the statute would indeed be thwarted.").

June 5, 2018) (collecting cases).[6]

Moreover, numerosity is not simply "a question of numbers." *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977). Rather, there are a several "factors that enter into the impracticability issue." *Id.* These "includ[e] the nature of the action, the size of the individual claims, and the location of the members of the class[.]" 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206-07 (3d ed. 2005). And the nature of this action, the size of individual claims, and the dispersed locations of class members, all weigh in favor of a finding of numerosity. *See* ECF No. 64 at 12-13, 21-24.

**II.     Ms. Wesley establishes commonality and predominance.**

Choosing not to address the majority of questions Ms. Wesley shows are common to the class and predominate over individualized inquiries, *see* ECF No. 64 at 14-15, 18-21, Snap—focusing largely on Ms. Wesley's statement that "whether Snap used a prerecorded voice in connection with the calls at issue is a question common to the proposed class," *id*. at 14—contends, absent support, that this question cannot be common or predominate because "Snap has no way of determining from its records whether a prerecorded message it attempted to deliver actually played." *See* ECF No. 71 at 21-33. Snap's contention lacks factual support, and is a non-sequitur.

From the outset, Snap's self-described inadequate recordkeeping does not protect it from class certification. *See infra* at 4-5 n.9 (collecting cases). No matter, Snap is able to determine

---

[6]     Along the same line, "[w]hether a claimant is a class member is a question that can be . . . appropriately, fairly, and efficiently resolved through a claims administration process as authorized by Rule 23." *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *4 (M.D.N.C. July 27, 2017); *see also Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) ("class members [may] be identified during a claims administration process if the class prevails"); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 52 (D.N.H. 2015) (noting that plaintiffs "will identify class members through a testimonial claims form administrative process"); *accord* ECF No. 64 at 24-28 (discussing ascertainability).

3

whether it attempted to deliver a prerecorded voice message to a telephone number, and whether Snap "actually le[ft] the message," by reviewing call disposition codes and call duration indicators found in its call records. *See* ECF No. 64-8 at 9 (55:3-13); 10 (64:24-65:9); Christensen Transcript at 60:24-61:9, attached as Exhibit B. Irrelevant, then, is Snap's list of hypothetical reasons "a prerecorded message will not play." ECF No. 71 at 22.[7] And relatedly irrelevant are the *Roberts* and *Sliwa* decisions, as both rest on factual circumstances that Snap testified are not at issue here. Furthermore, even if Snap had not testified as it did, Snap does not present any evidence that any prerecorded voice message it attempted to deliver "did not play." And hypothetical concerns do not defeat class certification. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009).[8]

Likely more important, assuming for the sake of argument that Snap's contention—that whether it used a prerecorded voice in connection with the calls at issue is a question that cannot be common—is factually supported, it is a contention that does not follow from a showing that Snap's records alone cannot establish to which telephone numbers Snap actually delivered a prerecorded voice message. Simply, Ms. Wesley's class is not, and does not have to be, defined by Snap's records. *See Birchmeier*, 302 F.R.D. at 250 (requiring "the contours of the class [to] be defined by [a] defendant's own recordkeeping . . . . would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity").[9] And class members here are able

---

[7] Snap's call records, which include the cellular telephone numbers to which Snap delivered the subject prerecorded voice messages, also include call disposition codes and call duration indicators for each call that Snap made by using the inContact dialer. *See* ECF No. 64-7.

[8] *See also G.M. Sign, Inc. v. Finish Thompson, Inc.*, 07-5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) (a defendant "cannot defeat class certification by asserting the vague possibility that some of the individuals" on a list of potential class members may not be part of the class).

[9] *Accord Reyes*, 2018 WL 3145807, at *14 ("the Court disagrees with BCA's position that the limitations in its records keeping . . . prove fatal to class certification"); *Rhodes v. Nat'l*

4

to attest to receiving a prerecorded voice message from Snap, like Ms. Wesley did. *See Rhodes*, 317 F.R.D. at 585 n.4 (finding "class members' self-identification—as cross-checked against defendant's records," sufficient to overcome individualized issues of class membership).[10] So no matter the adequacy of Snap's records, whether Snap used a prerecorded voice is a question that is common to the proposed class and predominates over individual issues. *See* ECF No. 64 at 14-15 (discussing commonality and collecting cases); *id*. at 18-21 (same, discussing predominance).

Snap also argues that "consent presents an individualized issue" because "Snap has shown that a 'wrong number' designation does not, in fact, indicate that the number dialed did not belong to a Snap customer at the time it was dialed," and "there can be no TCPA liability where an individual consented to receive prerecorded messages[.]" ECF No. 71 at 23. But this argues against a straw-man class. That is, Ms. Wesley neither defines her class by way of Snap's wrong-number designations, nor references Snap's records in her class definition—a definition Snap does not contend is improper. Rather, Ms. Wesley defines her class by way of non-Snap-accountholders, who necessarily did not provide prior express consent to be called. To be sure, Ms. Daley testified that if someone is or was a Snap customer that person is not a class member, *see* Daley Transcript at 63:22-64:3, and admitted she did not identify any person who met the class definition but who provided Snap with consent to be called. *See id*. at 58:16-59:15.

---

*Collection Sys., Inc.*, 317 F.R.D. 579, 583 (D. Colo. 2016) ("to countenance defendant's argument would put the court's imprimatur on potentially confusing and rather inadequate record keeping, undoubtedly inviting other [defendants] to adopt similarly lax procedures as an easy end run around class action lawsuits. Courts rightly condemn this a facile manner.").

[10] *See also In re: Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856, at *3 (D. Kan. Sept. 26, 2016) (same); *Helmer v. Goodyear Tire & Rubber Co.*, No. 12-CV-00685-RBJ-MEH, 2014 WL 1133299, at *4 (D. Colo. Mar. 21, 2014) (same); *accord Lavigne*, 2018 WL 2694457, at *7 n.5 ("[r]elying on affidavits submitted by class members is not a *per se* bar to class certification, especially where potential class members are likely to know whether they were ever a customer of the Defendants") (collecting cases).

Stated another way, Snap conflates the users of and subscribers to cellular telephone numbers that Snap designated as wrong numbers, with class members who by definition are non-Snap-accountholders. And this is important, because while Ms. Wesley proposes using Snap's records to identify *potential* class members for purposes of effectuating notice under Rule 23, she does not suggest that Snap's records alone identify each *bona fide* class member. To the contrary, Ms. Wesley notes she will use Snap's records—which contain indicators of instances where call recipients informed Snap it was calling a wrong person—as a starting point for effectuating class notice, not an end point for determining class membership. *Accord Reyes*, 2018 WL 3145807, at *13 (certifying a TCPA wrong number class, and noting that while the defendant's records "may not incontrovertibly establish that BCA dialed a wrong number, and thus would not conclusively establish who is a class member, that fact does not defeat class certification because Reyes is not proposing to rely solely on BCA's records to identify class members. Rather, those notations would represent a *starting point* from which Reyes can further define the class through the methods described by her expert, including the use of self-identifying affidavits and subpoenas.").[11]

And this makes Snap's reference to decisions like *Tomeo* and *Revitch* inapposite, because, unlike here, to be a member of the proposed classes in *Tomeo* and *Revitch* a class member must have had a telephone number associated with certain notations in the defendants' records. *See Tomeo v. Citigroup, Inc.*, No. 13 C 4046, 2018 WL 4627386, at *1 (N.D. Ill. Sept. 27, 2018) (the proposed class included those where "Citi's business records indicate that Citi was told that it had

---

[11] *Accord Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017) ("[W]e see no reason to refuse class certification simply because that same consumer will present her affidavit in a claims administration process after a liability determination has already been made."); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015) ("That does not mean a court cannot rely on self-identifying affidavits, subject as needed to audits and verification procedures and challenges, to identify class members.").

called the wrong number"); *Revitch v. Citibank*, No. C 17-06907, 2019 WL 1903247, at *3 (N.D. Cal. April 28, 2019) (the proposed class included persons "whose cellular telephone is identified in Defendant's Contact Utilities Database" and "where such person was not listed in Defendant's records as the intended recipient of the calls.").[12] Consequently, where the defendants in *Tomeo* and *Revitch* defeated class certification because they offered evidence that their wrong number designations often did not mean they called a wrong number—thus, class members, who were defined by wrong number designations, might not have been recipients of wrong number calls, and accordingly may have provided the defendants prior express consent to be called—a similar offer of evidence here cannot defeat class certification because having a wrong number-designated telephone number is not a prerequisite to being a class member, as it was in *Tomeo* and *Revitch*.

Explained differently, because the defendants in *Tomeo* and *Revitch* offered evidence that their wrong number designations often did not mean they called a wrong number, and because having such a designation was a prerequisite to class membership, the *Tomeo* and *Revitch* courts found common questions did not predominate because a sizable number of class members likely consented to the defendants' calls. But here, Snap presents no evidence that a single member of Ms. Wesley's proposed class consented to its calls. And how could it? Ms. Wesley defines her proposed class not by telephone numbers with a wrong-number designation, but rather by non-Snap-accountholders who necessarily did not provide Snap consent to place calls to their telephone

---

[12] *Accord Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 6 (D. Mass. 2019) (defining the class based on inclusion in the defendant's business records); *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 266 (M.D. Fla. 2019) (same, and also defining the class based on receipt of calls "after Defendants had already documented the number as a wrong number in their records"); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 541 (D. Minn. 2017) (same, and basing the court's holding, in part, on the erroneous conclusion that "consent is not an affirmative defense"); *Davis v. AT&T Corp.*, No. 15CV2342-DMS (DHB), 2017 WL 1155350, at *5 (S.D. Cal. Mar. 28, 2017) (same, and also including "without their prior express consent" as class membership criteria).

7

numbers. Prior express consent, therefore, does not present individualized issues in this matter.

Not surprising, then, is that courts presented with TCPA wrong-number class definitions defined by non-accountholders—like Ms. Wesley's class—have certified the classes over the objections Snap now presents. *See, e.g.*, *Knapper*, 329 F.R.D. at 244 ("courts have certified TCPA cases despite the possibility that a substantial proportion of the phone numbers marked as 'wrong number' in Defendant's call records may not have actually been a wrong number. *See Johnson . . . ; Abdeljalil . . . ; West . . .*"); *see also Lavigne*, 2018 WL 2694457, at *8 (collecting cases).

**III.   Ms. Wesley is a typical and adequate class representative.**

Based on nothing more than a reference to the fact that Ms. Wesley "worked in collection or customer service," Snap suggests Ms. Wesley "invited the calls" that give rise to this matter, and accuses her of intentionally "not answer[ing] calls for over three months, failing to inform Snap that it had the wrong number, thereby racking-up alleged TCPA violations." ECF No. 71 at 13-15. Snap, however, not only fails to present any evidence that Ms. Wesley acted in such a manner, but also neglects to address the many facts that undercut its false narrative.[13]

To start, Snap's serious accusation of impropriety rests largely on its unsupported contention that Ms. Wesley "never answered a call from Snap." *Id*. at 28; *see also id*. at 13 ("[n]o one ever answered the calls intended for Mr. Johnson"); *id*. at 15 ("she did not answer calls for over three months"). But this is not true. Indeed, Ms. Wesley testified that although she was often unable to answer Snap's calls because she was at work when she received them, she did answer some of them, and when she did so she received a prerecorded voice message that did not allow

---

[13]   Prior to this matter, Ms. Wesley had never filed a lawsuit, had never been sued, had never informed a company that it violated the TCPA, had never made a demand for compensation under the TCPA, had never received compensation for claims that a company violated the TCPA, and does not know any family member, friend, or work colleague that received compensation for an alleged TCPA violation. *See* Wesley Transcript at 14:20-23; 37:2-40:25, attached as Exhibit C.

her to connect the call to a live person. *See* ECF No. 64-4 at 24-26 (154:20-156:21). Ms. Wesley also testified that her intention in answering Snap's calls was to notify Snap it was placing calls to a wrong number. *See id.* at 29 (173:14-21), 33-34 (242:4-243:10).

Notably, this scenario—that Snap placed a call to Ms. Wesley's cellular telephone number, she answered the call, Snap's dialing system mistakenly believed her voice was an answering machine, and Snap's dialing system played the very prerecorded voice message Ms. Wesley testified receiving when she answered Snap's calls—is something Snap's representative testified could happen. *See* ECF No. 64-8 at 21 (142:8-24). It is also a circumstance referenced by the inContact dialer manual.[14] As well, T-Mobile's records suggest that it occurred here.

Specifically, Snap's call log includes an October 13, 2019 call disposition code reading "Answering Machine Left Message"—which means Snap delivered a prerecorded message, *see* SNAP_15; ECF 64-8 at 10 (63:23–64:23); 11 (77:3-18)—that corresponds with a T-Mobile record showing a successfully completed call with a duration of 36 seconds, placed from a Snap telephone number to Ms. Wesley's cellular telephone number, which was not transferred to voicemail. *See* T-Mobile Records, attached as Exhibit D. Consequently, Snap's argument that Ms. Wesley's testimony that she answered calls "is belied by Snap records," or by "Snap's call log [that] does not show any answered calls," is flawed. That is, the absence of information included in Snap's apparently deficient document production does not, without more, rebut Ms. Wesley's testimony and corroborating T-Mobile records.[15]

---

[14] *See* https://help.nice-incontact.com/content/acd/skills/managemultipleskillsatonce. htm?Highlight=Answering%20Machine%20Detection%20Options (referencing, as potential dialer programing criteria, the amount of time a call recipient has to say something before the dialer automatically determines that the recipient is an answering machine).

[15] This is not the only misstatement Snap makes based on an unfounded conclusion drawn

Considering as much, Snap's contention that Ms. Wesley is neither typical nor adequate because she "did nothing to stop unwanted calls," and "invited the communications from Snap to further her ambitions of being a TCPA plaintiff," *id*. at 29-30, is baseless. Of course, even if Ms. Wesley had neither answered any of Snap's calls, nor informed Snap it reached a wrong number, she would be both a typical and adequate class representative. *See, e.g.*, *Knapper*, 329 F.R.D. at 243 (finding typicality satisfied, and stating: "This is so even if Plaintiff . . . did not talk with a call agent or otherwise inform Defendant about the wrong number. * * * The Court is unaware of, and Defendant has not pointed to, any requirement that a potential plaintiff call and inform the defendant that it has an incorrect phone number. Nor does Defendant articulate why that would affect liability, assuming Defendant had already called that person without its consent.").

---

from its call records. For instance, Snap states that after Ms. Wesley informed Snap it was placing calls to her cellular telephone number in error, she "never received another call from Snap." ECF No. 71 at 13. However, T-Mobile records show that after Ms. Wesley informed Snap on February 11, 2020 that it was placing calls to a wrong number, Snap placed at least one call to Ms. Wesley's cellular telephone number—on February 24, 2020—from telephone number (321) 325-9340, which Snap admits is a telephone number from which it placed calls on February 24, 2020. *See* T-Mobile Records; ECF No. 64-12 at 5-7. Thus, despite Snap's unqualified statement otherwise, it placed at least one call to Ms. Wesley's cellular telephone number after its records designated the telephone number as a wrong number. Snap also sent at least two text messages to Ms. Wesley's cellular telephone number after February 11, 2020. *See* ECF No. 64-9 at 2.

And Snap makes other misleading statements, as well. At one point, while insinuating that Ms. Wesley was not the sole subscriber to her cellular telephone number during the relevant time period, it argues that "T-Mobile first associates Plaintiff with the Number on December 4, 2019 and Plaintiff had no explanation for this discrepancy." ECF No. 71 at 13. Both of these contentions are inaccurate. In short, T-Mobile's records include an account activation date of "11/29/2017" under the name "Brandi Wesley," *see* ECF No. 71-20 at 3, and Plaintiff testified that the "discrepancy" could be related to a change in her billing information. *See* ECF No. 71-17 at 15-16. Separately, referencing that Ms. Wesley saved only 8 of the 20 prerecorded voice messages Snap delivered to her, Snap states that "[t]he number of prerecorded messages actually received by Plaintiff is another significant discrepancy." ECF No. 71 at 13-14. But that Ms. Wesley did not permanently save every prerecorded voice message she received does not change the fact that Snap's own records demonstrate it delivered 20 prerecorded voice messages to Ms. Wesley's cellular telephone number. *See* ECF No. 64-7; ECF 64-8 at 9 (55:2-15).

| | |
|---|---|
| Dated: June 11, 2021 | */s/ Aaron D. Radbil*<br>Aaron D. Radbil<br>Alexander D. Kruzyk<br>GREENWALD DAVIDSON RADBIL PLLC<br>401 Congress Avenue, Suite 1540<br>Austin, Texas 78701<br>Phone: (512) 803-1578<br>aradbil@gdrlawfirm.com<br>akruzyk@gdrlawfirm.com<br><br>Michael L. Greenwald<br>GREENWALD DAVIDSON RADBIL PLLC<br>7601 North Federal Highway, Suite A-230<br>Boca Raton, Florida 33487<br>Phone: (561) 826-5477<br>mgreenwald@gdrlawfirm.com<br><br>Jason E. Greene<br>Jared D. Scott<br>ANDERSON & KARRENBERG, P.C.<br>50 West Broadway, Suite 700<br>Salt Lake City, Utah 84101<br>Phone: (801) 534-1700<br>jgreene@aklawfirm.com<br>jscott@aklawfirm.com<br><br>*Counsel for Ms. Wesley and the proposed class* |

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2021, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will provide notice to all counsel of record. I also certify that on June 11, 2021, I caused to be mailed a copy of the foregoing by U.S. mail to Derrick Deon Jackson, Jr. a/k/a Derrick Johnson:

>1600 Pecan Chase Circle, Apt. 9
>Arlington, Texas 76012

*/s/ Aaron D. Radbil*
Aaron D. Radbil
