# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT

 2                      DISTRICT OF UTAH

 3         CIVIL ACTION NO. 2:20:CV00148-RJS-JCB

 4   ~~~~~~~~~~~~~~~~~~~~~~~~~~~
     BRANDI WESLEY, on behalf of
 5   herself and others similarly
     situated,
 6        Plaintiff,

 7   v.

 8   SNAP FINANCE LLC,
          Defendant.
 9   ~~~~~~~~~~~~~~~~~~~~~~~~~~~
     SNAP FINANCE LLC,
10        Third-Party Plaintiff,

11   v.

12   DERRICK DEON JACKSON, JR.,
     a/k/a DERRICK JOHNSON,
13        Third-Party Defendant
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~
14

15                    EXPERT WITNESS

16                   ZOOM DEPOSITION OF

17                    MARGARET DALEY

18                   FEBRUARY 18, 2021

19                       1:06 P.M.

20

21

22

23   Job #32790

24   REPORTER:  TRACY COFFMAN
```

14 Q. Right, and did Ms. Wesley self-attest to
15    being a member of all three proposed classes?
**16 A. I believe she has.  She said used the phone**
**17    exclusively and received the calls and texts.**



Page 50

2  Q.  So what you're saying is nobody that's
3      associated with those 92.6 percent of
4      telephone numbers could meet any of the three
5      proposed class definitions?
6  **A.  That's not what I'm saying.  No, I'm not**

Page 51

Page 52

Page 53



Page 54

Page 55

Page 56

Page 57

4  Q. I understand that, I just want a clear answer
5     as to whether or not part of your expert
6     opinion is whether particular people meet or
7     do not meet any of the proposed class
8     definitions?
9  A. I've been asked to look at whether or not
10    there is evidence.
11            I am not a decider of the legal
12    opinions. The legal opinions are up to the
13    court.
14            Whether or not a particular person
15    is in fact a class member is not within the
16    scope of my retention. That is a legal

16 Q. Sticking then with the class definitions on
17 page 18, did you identify any persons who
18 meet any of the three proposed class
19 definitions?
**20 A. No.**
21 Q. So then it necessarily follows then, because
22 you didn't identify any people who met any of
23 the three proposed class definitions, you
24 didn't identify any bona fide class members

1 who you believe consented to receiving calls
2 from SNAP, is that right?
**3 A. It's outside the scope. I wasn't asked to**
**4 determine legal consent, and your question**
**5 presupposes that I was.**
6 Q. To be clear then, and we've covered this, but
7 to finish the point, you're not offering any
8 opinion as to whether any members of any of
9 the three proposed classes consented to
10 receiving a call, a text, or a prerecorded
11 message from SNAP, is that right?
**12 A. Can you read that back to me please.**
13 (Question read.)
**14 A. Whether or not from a legal consent, I am not**
**15 providing any legal opinions.**

**5 7.6 percent of the 500 sample**
**6 remained after my analysis, and those would**
**7 need additional investigation, because the**
**8 names that were identified as potential class**
**9 members, they would, those names are still**
**10 highly unreliable.**


Page 62: [redacted]

Page 63:
22  Q.  Right, because we would agree that if
23      somebody is or was a SNAP customer, they
24      necessarily don't meet any of the three class

Page 64:
1       definitions, right?
2   A.  Right, and your very tools are pointing back
3       to SNAP customer names.
4   Q.  Okay, turning to paragraph 43 on page 19, and
5       we addressed this generally.
6   A.  I'm sorry, can you give me a chance to read
7       it.
8   Q.  Yeah, I'm bad at that, take as long as you
9       need.
10          We talked about this generally at
11      the beginning, in terms of you're not
12      offering an opinion on the publication
13      aspect, but more specifically as it relates
14      to your work in this case, did you issue any
15      kind of press release in an effort to find
16      potential class members?
17  A.  No.
18  Q.  Did you establish a website where people who
19      received wrong number calls from SNAP could
20      learn about whether they may be members of
21      the proposed classes?
22  A.  No.
23  Q.  Did you do any kind of online advertising,
24      looking for folks who may have received a

Page 65:
1       wrong number call from SNAP?
2   A.  No.
3   Q.  Are you familiar with advertising on
4       Facebook, that it can be directed to
5       particular telephone numbers?
6   A.  No.
7   Q.  So I'm presuming then, in this case, you
8       didn't direct any advertising on Facebook to
9       any of the 500 telephone numbers you sampled?
10  A.  No.
11  Q.  Did you call any of the 500 numbers you
12      sampled?
13  A.  No.
14  Q.  Did you send text messages to any of the 500
15      numbers you sampled?
16  A.  No.
17  Q.  Did you take any steps to allow potential
18      class members to self-identify?
19  A.  Well, if they wanted to call me, they
20      could've.  No.
21  Q.  Did anyone call you?
22  A.  No.
23  Q.  All right, let's turn to paragraph 56, which
24      is on pages 23 to 24.



Page 116
1 Q. Yes, I think there's a distinction between
2 who gets direct mail class notice and who is
3 a bona fide class member, and we would agree
4 that those are two separate things, right?
5 A. You know, who gets notice, who gets mail,
6 etcetera, the whole notice piece, that is not
7 what I am opining about.
8     I am opining about whether or not
9 the methodology articulated by your expert
10 can identify any bona fide class members and
11 whether or not it's accurate.
12     And to the extent that it's
13 providing notice, direct notice, whether or
14 not it's actually going to provide notice to
15 real bona fide class members.
16     If it's based on highly inaccurate
17 and wrong data, that's going to give it names
18 of people who never got telephone calls, the
19 answer is, you can't identify the people and
20 you can't, your notice plan is going to not
21 notice the right people if you're using this
22 data that she has identified.
23 Q. Right. In that scenario, class members would
24 have to self-identify, in other words?



19  Q.  As part of the analysis you did in your
20      declaration, are you presuming that the
21      records that SNAP has on the outgoing calls
22      it makes are accurate?
**23  A.  Yes.**
24  Q.  And are you presuming that the names that

Page 126

1  SNAP has associated with its own customers
2  are accurate?
3  **A. I'm presuming to use the list -- do I know**
4  **whether or not Margaret Daley is listed as**
5  **Peggy Daley, and which one is accurate?**
6  **I mean, I'm presuming that the**
7  **records that have been given to me, the**
8  **business records are accurate in that they're**
9  **the business records of the company.**
10  **But I haven't undertaken any**
11  **particular, any individualized investigation**
12  **to make sure, I mean, they're business**
13  **records, there are going to be errors in**
14  **there.**
15  **But I think, if they're business**
16  **records, you can presume them to be accurate**
17  **as contemporaneous records.**

